HUGHES, J.
| ?In this appeal, two Ascension Parish residents who own sporting goods stores in the parish, contending that the use of public funds to finance a private retail establishment is unconstitutional, challenge the trial court’s bond validation judgment. We affirm the trial court.
FACTUAL AND PROCEDURAL BACKGROUND
On July 27, 2005, plaintiff, the Board of Directors of the Industrial Development Board of the City of Gonzales, Louisiana, Inc. (Board), acting as the governing authority of the Industrial Development Board of the City of Gonzales, Louisiana, *746 Inc. (IDB), filed this petition for a motion for judgment under the “Louisiana Bond Validation Act,” La. R.S. 13:5121 through 5130, which permits an expeditious judicial determination of the legality and validity of bonds prior to their issuance in order to ensure their marketability in investment channels. The Board sought validation of the issuance of “Tax Increment Revenue Bonds” (Bonds) to fund a proposed project to be known as the “Cabe-la’s Project” (the Project), featuring the construction of a Cabela’s retail store, a 165,000 square foot facility specializing in hunting, fishing, camping, and outdoor gear. Specifically, the Project included: (1) the acquisition of approximately 49.22 acres of real estate (the Cabela’s property); (2) the acquisition, development, construction, and equipping of the Cabela’s retail store and related infrastructure, to be operated by Cabela’s; (3) the construction of related public improvements and infrastructure to support the retail store and remaining Cabela’s property within the economic development district; (4) the construction of a wildlife museum; and (5) the development and construction of related public improvements and infrastructure needed to support approximately 48.5 acres within the economic development district, constituting the “Sportsman Park Center.”
To implement the Project, governmental officials created and empowered certain entities to enter into a series of agreements detailing the funding structure of the Project, pursuant to the “Tax Increment Financing Act” (TIF Act), La. R.S. 33:9038.1 through 9038.10. On April 11, 2005, the governing authority for the City of Gonzales created the Gonzales Economic Development District No. 1 (the District) as an |/‘economic development district” within the City of Gonzales, pursuant to La. R.S. 33:9038.2, which gives such an entity the status of a political subdivision of the state. The ordinance creating the District identifies it as encompassing a tract of land containing 223.41 acres along Interstate 10. Various “project documents” were drafted, including a “Cooperative Endeavor Agreement” to be executed by the District; Cabela’s Retail LA, LLC; developer Carlisle Resort, LLC (Carlisle); the IDB; and the State of Louisiana. Other documents involving some of the principal parties included a “Trust Indenture,” a “Lease Agreement with the Option to Purchase,” and a “Public Facilities Management Agreement.”
Basically, the project documents set forth the terms of the project in several steps. The IDB would issue the Bonds in an amount not to exceed $49,875,000. Cabela’s agreed that it or an affiliate would purchase, on a “pay-as-you-go” basis, up to $42,375,000 of the Bonds, and Carlisle agreed that it or an affiliate would purchase, on a “pay-as-you-go” basis, up to $7,500,000 of the Bonds.[1] Through a series of transactions, upon issuance of the bonds, the IDB would acquire ownership of the Cabela’s property; it would continue to own the Cabela’s property, including all facilities and improvements constructed thereon, as long as the Bonds remained issued and outstanding. During that time, the IDB would lease the Cabela’s property and facilities to Cabela’s. Serving as partial consideration for the lease was the economic benefit of the Project to the City and surrounding areas. Under the lease agreement, Cabela’s “rents” would consist of payments in an amount equal to the ad valorem taxes that would have been due had the site been privately owned, and “additional rents” would include payment *747 of insurance costs, maintenance costs, and improvement costs to the suppliers of those services. Carlisle was obligated to develop a “Sportsman Park Center” on 48.5 acres adjoining the Cabela’s retail center in the District. Upon expiration or payment in full of the Bonds, Cabela’s would be given the option to purchase the Cabela’s property, including all improvements thereon, for its adjusted fair market value, with the purchase price being subject to a number of offsets. These offsets would include, among other things, credits for all rents and additional rents paid |4by Cabela’s during the lease term, credits for each job created by Cabela’s, and a $1,900,000 credit for each year Cabela’s operated the retail center during the lease term.
The project documents provided that the Bonds were to be secured by, and the principal and interest thereon were payable from, a pledge and dedication of taxes from two sources: (1) the “incremental increase” of the one and one-half percent city sales tax from the City of Gonzales collected within the District, and (2) the “incremental increase” of the one and one-half percent state sales tax collected within the District. The project documents define the term “sales tax increment” as those tax revenues from taxpayers in the economic development district exceeding the sales tax revenues that were collected for the taxing authority in the year immediately prior to the year in which the area was designated as an economic development district. According to the documents, there were no sales and use taxes collected within the District during the “Base Year,” defined as the fiscal year of the City of Gonzales ending May 31, 2005.
On April 23, 2005, the voters in the District were asked to approve the rededi-cation of two local sales taxes to fund the project in a special election held in the City of Gonzales. The first tax, initially approved by voters on September 10,1966, authorized the City of Gonzales to collect a one percent sales tax to be dedicated and used for certain enumerated purposes, including the construction, maintenance, and operation of streets, sidewalks, public utilities, and recreational facilities, as well as public entities, including the Fire Department, City Hall, and a civic building. The second, approved by voters on April 1, 1989, authorized the City to collect a one-half of one percent sales tax for the purpose of constructing and operating sewerage and drainage facilities, streets, and gas and water supply and distribution facilities. In the 2005 special election, voters were asked to authorize the City of Gonzales to amend the provisions to add the language “promoting economic development” in addition to the purposes set forth in the respective sales tax propositions approved at the 1966 and 1989 elections. The proposition to amend the tax ordinances was approved by a vote of 78%.
IbA series of resolutions was passed over the next several months giving the parties authority to enter into agreements to carry out the proposed financing. On July 22, 2005, the State Bond Commission approved the issuance, sale, and delivery of not more than $49,875,000 Tax Increment Revenue Bonds, taxable or tax-exempt or both, maturing no later than thirty years from the date of issuance. Thereafter, the Joint Legislative Committee on the Budget approved the contribution of one and one-half percent of the state portion of the sales tax generated by the District, subject to several limitations, including a $10,500,000 limit on the sales tax revenues dedicated to the venture, the maintenance of a certain number of jobs, and the provision of health care benefits to the employees.
*748 In this proceeding, the Board asked the court to render a judgment establishing and declaring: (1) the legality and validity of the issuance of the Bonds; (2) the legality and validity of all proceedings held and actions taken by the Board and others in connection with the authorization or issuance of the Bonds; (3) the legality and validity of the project documents and all other documents executed in connection with the issuance of the Bonds and all terms and provisions contained therein; (4) the legality and validity of all proceedings held and actions taken by the Board in connection with the authorization and execution of the project documents and all other documents executed in connection with the Bonds; (5) the exemption of the Bonds and income therefrom from all taxation in the state in accordance with La. R.S. 33:9038.8; (6) the exemption of the Project from the Public Bid Law; and (7) the legality and validity of the rededication of the sales and use tax pledged to finance the Bonds. The Board also asked the court to issue a permanent injunction against any person’s institution of an action or proceeding contesting, among other things, the legality and validity of the Bonds, the project documents, the pledges of revenue, and the legality and validity of the TIF Act and the Act’s authorization of the project documents and transactions contemplated thereby.
The named defendants in the litigation included all taxpayers, property owners, citizens of the City of Gonzales and the Gonzales Economic Development District, non-residents owning property or subject to taxation in the City or District, and “all other | ^persons interested in or affected in any way” by the issuance of the Bonds. On August 16, 2005, two Ascension Parish residents who owned sporting goods stores in the parish, C.J. Hebert and Carl Single-tary, filed a response to the Board’s motion for judgment in which they asserted a peremptory exception raising the objection of no cause of action. Therein, the defendants challenged the constitutionality of the TIF Act to the extent that it allowed public bodies to loan, pledge, or donate public funds for uses by a private retailer in the development, construction, and equipping of a retail store, which, they asserted, is prohibited by Article VII, § 14(A) of the Louisiana Constitution. They also charged that the Project’s use of public funds to, in effect, subsidize a particular retailer violated the equal protection clauses of the federal and state constitutions because of its unequal treatment of similarly situated retail sporting goods stores. The defendants did not challenge the constitutionality of the use of public funds for the development and construction of the infrastructure to support the Project or for the museum construction.
A hearing was held on the motion, during which both sides introduced documentary evidence. Thereafter, the trial judge entered judgment declaring the TIF Act constitutional as applied to the Project and denying the exception of no cause of action. In written reasons for judgment, the judge concluded that the defendants had failed to demonstrate a specific constitutional provision that would prohibit the legislature from enacting the TIF Act. Additionally, the judge rejected the equal protection challenge upon finding that the defendants failed to demonstrate that they were in fact subject to different treatment under the TIF Act, observing that any individual or business qualifying as an “economic development project” could avail itself of the Act’s provisions.
Thereafter, the trial judge upheld the validity and legality of the Cabela’s Project, finding that the Board acted legally and within the scope of its authority in approving the acquisition of the Bonds. Judgment was entered, granting the *749 Board all of the relief it sought in its motion for judgment, decreeing that the Bonds, the proceedings held and documents confected in connection therewith, and the rededication of the sales 17and use taxes pledged to finance the Bonds were legal and valid and, therefore, were binding on the defendants.
This appeal, taken by defendants, followed. Because this appeal has been taken pursuant to the Bond Validation Act, it has been assigned expedited status. See La. R.S. 13:5128.
DISCUSSION
The Bond Validation Act precludes a court from invalidating bonds unless it finds substantial defects, material errors and omissions in the incidents of such bond issue. In this appeal, we are asked to decide whether the bond issuance is constitutionally defective with respect to that portion of the Project authorizing the use of public funds to finance the construction of a retail sporting goods store.
The TIF Act was enacted in 2002 to promote economic development and allows money generated from an economic development project to serve as a funding source for the project. Specifically, the Act authorizes a local governmental subdivision or entity to participate in tax increment financing of economic development projects. La. R.S. 33:9038.2 and 9038.4. For the purposes of the Act, the term “economic development project” includes, without limitation, “any and all projects suitable to any industry determined by the local governmental subdivision, or as appropriate, the issuers of revenue bonds, to create economic development.” La. R.S. 33:9038.4(M). The term also encompasses “public works and infrastructure and projects” to assist eight categories of industries “within the meaning of Article VI, Section 21 of the Louisiana Constitution.” La. R.S. 33:9038.4(M). Specifically identified as industries falling under the scope of the TIF Act are “commercial, retail, and related industries,” along with “[a]ny other industry determined by the local governmental subdivision or issuer of revenue bonds, as appropriate, whose assistance will result in economic development.” La. R.S. 33:9034.4(M)(4) and (8).
The TIF Act, in La. R.S. 33:9038.4, permits a local government to issue revenue bonds payable from revenues generated by economic development projects with a pledge and dedication of the amount of the “sales tax increment.” The term “sales tax increment” is defined as that portion of the designated sales tax collected each year |sfrom taxpayers located within an economic development district which exceeds the designated sales tax revenues so designated that were collected in the year immediately prior to the year in which the district was established. La. R.S. 33:9038.4(A)(2). The Act provides that the economic development district is to comprise the “sales tax area,” which “shall be the area from which sales tax increments are to be pledged and dedicated to the payment of the revenue bonds.” La. R.S. 33:9038.4(B). The local governmental authority and each participating tax recipient entity are required to designate the local sales taxes which are to be used in determining the sales tax increment and the initial baseline collection rate for the sales area. La. R.S. 33:9038.4(0). The increment of the designated taxes that can be pledged and dedicated to the amount of the revenue bonds is the amount of designated sales tax collected in the sales tax area each year in excess of the initial annual baseline collection rate. La. R.S. 33:9038.4(D). The TIF Act also authorizes the State of Louisiana to pledge and dedicate incremental increases in sales taxes to pay the revenue bonds of a local economic *750 development project. La. R.S. 33:9038.4(A)(6).
In this appeal, the financing agreement utilized by the governmental authorities in connection with the Project is attacked on several fronts. In one of their assignments of error, appellants urge that the TIF Act itself does not provide the authority for the Project. Appellants submit the TIF statute only contemplates the use of public funds for those projects that will assist in the development of businesses, such as public works and infrastructure.
However, in La. R.S. 33:9038.4(J), the legislature mandated that the TIF Act be liberally construed for the accomplishment of its purposes of encouraging economic development. In addition to authorizing the use of sales tax increments to finance economic development projects, the Act broadly defines those costs of an economic development project that may be incurred by local governmental subdivisions to include “the sum total of all reasonable or necessary costs incurred incidental to or in furtherance of an economic development project ....” La. R.S. 33:9038.6. Such allowable costs include, but are not limited to property acquisition, including land and other real or personal property rights, assembly costs, costs of construction of public _[c¡improvements, including buildings, and even costs of renovating existing buildings within an economic development district. La. R.S. 33:9038.6(2), (4), and (5). Thus, we decline to read the Act as limiting governmental assistance to only those aspects of an economic development project falling within the ambit of public works and infrastructure to support the project development. Rather, the Act specifically authorizes public assistance to economic development projects involving the private retail industry, and we find nothing therein that would prohibit the financing scheme developed in connection with the Project.
Having concluded that the Project’s funding scheme is authorized under the TIF Act, we now address appellants’ arguments that public financial assistance to the private retail industry is unconstitutional.
Unless the fundamental rights of a person are involved, legislative acts are presumed to be valid. Board of Directors of the Louisiana Recovery District v. All Taxpayers, 529 So.2d 384, 387 (La.1988). This presumption is especially forceful in the case of statutes enacted to promote a public purpose, such as statutes relating to taxation and public finance. Id. The party attacking such a statute has the burden of showing clearly that the legislation is invalid or unconstitutional, and any doubt as to the legislation’s constitutionality must be resolved in its favor. Id. This is a heavy burden. It is not sufficient to show that a statute’s constitutionality is fairly debatable; it must be shown clearly and convincingly that it was the constitutional aim to deny the legislature the power to enact the statute. Hite v. Larpenter, 2004-1821, p. 4 (La.App. 1st Cir.9/23/05), 923 So.2d 140, 145. Thus, to successfully challenge a legislative act as unconstitutional, the challenger must establish that no circumstances exist under which the act would be valid. AFSCME, Council #17 v. State ex. Rel. Dept. of Health & Hospitals, 2001-0422, p. 8 (La.6/29/01), 789 So.2d 1263,1269.
We first address appellants’ argument that the funding scheme amounts to donation of public funds prohibited by Article VII, § 14(A) of the Louisiana Constitution.
First, appellants submit the use of public funds to pay for the construction and equipping of Cabela’s constitutes a donation of public funds to a private entity *751 prohibited by Article VII, § 14(A) of the Louisiana Constitution. Secondly, appellants Imcontend the local government’s action in assisting one retail outlet to the detriment of other sporting goods outlets already in business results in differential treatment in violation of the equal protection clauses of the federal and Louisiana constitutions.
Louisiana Constitution article VII, § 14(A) provides that “[e]xeept as otherwise provided by this constitution, the funds, credit, property, or things of value of the state or of any political subdivision shall not be loaned, pledged, or donated to or for any person, association, or corporation, public or private.” This court has previously addressed the issue of whether the use of sales tax increments pursuant to the TIF Act to fund the development of a retail facility for use by a private business is unconstitutional. In Denham Springs Economic Dev. Dist. v. All Taxpayers, Property Oimers and Citizens of the Den-ham Springs Economic Dev. Dist., 04-1013 (La.App. 1 Cir. 6/4/04), 885 So.2d 1153, rev’d on other grounds, 04-1674 (La.2/4/05), 894 So.2d 325, a taxpayer asserted that the use of sales tax increments to fund the development of a Bass Pro Shops retail outlet amounted to a loan, pledge, or donation of funds belonging to the state or political subdivision in violation of Article VII, § 14(A). In rejecting this argument, this court held that the first paragraph of Article VII, § 14 could not be read in isolation, but instead must be considered in light of the other paragraphs of that article, along with two sections of Article VI, which empower governmental entities to incur debts and issue bonds. This court concluded that when Article VII, § 14(A) was read in conjunction with paragraphs (B) and (C) of that article, along with §§ 19 and 20 of Article VI, it was clear that the redactors of the Louisiana Constitution expressly excepted the pledge and/or transfer of governmental property in connection with bond issuances from the prohibition against things of value owned by the state being “loaned, pledged, or donated.”
Article VII, § 14(B)(3) specifically provides that the prohibited uses noted in § 14(A) shall not prevent “the pledge of public funds, credit, property, or things of value for public purposes with respect to the issuance of bonds or other evidences of indebtedness to meet public obligations as provided by law.” The law has been clearly set forth by the Legislature in the TIF Act.
InNor can the agreement between the IDB and Cabela’s be strictly considered a wholly gratuitous donation. Cabela’s has obligations to fulfill to the IDB and to third parties as contemplated by the agreement. And as discussed in the Den-ham Springs case, an economic enterprise such as Cabela’s does not come to the table empty handed. Jobs, tax revenues, and general economic development and growth cannot be ignored in the equation.
We agree with this court’s original holding in the Denham Springs case, and adopt the reasoning of that court in holding that a bond issuance secured by the pledge of sales tax increments generated by the project to fund the development of a private retail facility does not violate Article VII, § 14(A) of the Louisiana Constitution. In so doing, we emphasize that in enacting the TIF Act, the legislative aim was limited to allowing a governmental entity use of incremental tax dollars generated by an economic development project to provide public assistance to retailers in order to stimulate the economy. The TIF Act does not permit a governmental entity to use existing public funds or properties to assist a private retailer. Rather, it gives a local government the power to use *752 funds generated by the project itself, funds the taxing authority would not have otherwise had in the absence of that project, to actually increase its overall tax revenues and provide jobs to its citizens. We conclude appellants failed to meet their heavy burden of demonstrating clearly and convincingly that the Louisiana "Constitution deprives the Legislature of the power to enact legislation allowing local governments to promote economic development by offering financial incentives to businesses in exchange for the financial advantages accruing therefrom.
In their last assignment of error, appellants contend that the financing scheme permitted by the TIF Act violates the equal protection clauses of the Fourteenth Amendment to the United States Constitution and Article I, § 3 of the Louisiana Constitution. Appellants contend that the Project creates two classifications: the beneficiary class, Cabela’s, and the disadvantaged class, consisting of all other existing retail stores. They urge that public assistance to one retailer while denying such assistance to other retailers clearly violates notions of equal protection. Specifically, they submit that public financing of Cabela’s provides an unfair economic advantage to |1?the retail outlet and causes other taxpayers to be treated differently. Appellants stress that they have already paid the costs of acquiring their buildings and the costs of equipping their stores, and will continue to pay these costs, while the public will bear such costs for the Cabela’s store. This allows Cabela’s to have an unfair pricing advantage, they contend, as Cabela’s will not have to pass the costs of operating its building or its rent costs on to its customers. Additionally, appellants contend the TIF Act itself allows for disparate treatment of new retailers and existing retailers, because it allows financing only by “incremental” tax dollars, effectively meaning that a retailer who opens on undeveloped land has an advantage over those who are already operating, because the existing retailer will not be able to amass the same level of “incremental” taxes.
To some extent, all economic inducement projects result in one or more private enterprises receiving public assistance while others do not. However, equal protection clauses have never required absolute equality or precisely equal advantages. Johansen v. Louisiana High School Athletic Ass’n, 04-0937 (LaApp. 1 Cir. 6/29/05), 916 So.2d 1081, 1089. The TIF Act undeniably is a purely economic regulation. Where, as here, no fundamental or express constitutional right or “suspect” class, such as race or religion, or any other enumerated class such as birth, age, sex, culture, or political affiliation is alleged as the basis for discrimination, the use of another classification is subject to the minimal or lowest level of scrutiny under the guarantees of both constitutions. Id. Thus, in determining whether an economic regulation violates the equal protection clauses, a court may not sit as a super-legislature to judge the wisdom or desirability of legislative policy determinations. Lakeside Imports, Inc. v. State, 94-0191, p. 6 (La.7/5/94), 639 So.2d 253, 257. Instead, an economic classification must only be rationally related to a legitimate governmental purpose to withstand an equal protection challenge. Livingston Downs Racing Ass’n, Inc. v. State of Louisiana, 96-2890, p. 10 (La.12/2/97), 705 So.2d 149, 154.
In the TIF Act, the legislature declared that bonds issued under the Act are declared to be for an essential public and governmental purpose. La. R.S. 11S33:9038.8(H). In Denham Springs Economic Dev. Disk, 885 So.2d at 1161 n. 9, this court recognized that the TIF Act *753 served the valid governmental purposes of economic development and the enhancement of future revenues, noting the heightened emphasis placed on the need for economic development expressed by the legislature, and the obvious intent to allow local governmental entities to share in the financing of such ventures that will result in increased revenues. We find the Cabela’s funding, authorized by the TIF Act, to be rationally related to the legitimate governmental purposes of economic development and enhancement of future revenues. Therefore, we reject the equal protection argument raised by appellants.
CONCLUSION
For the foregoing reasons, the judgment appealed from is affirmed. All costs of this appeal are assessed to appellants.
AFFIRMED.
PARRO, J., dissents and assigns reasons.
DOWNING, J., concurs.
McDONALD, J., dissents for the reasons assigned by Judge Parro.

. Cabela's and Carlisle were authorized to sell the Bonds at their discretion and in accordance with the restrictions set forth in the Bond Indenture Agreement.