938 So.2d 11 (2006)
The BOARD OF DIRECTORS OF the INDUSTRIAL DEVELOPMENT BOARD OF the CITY OF GONZALES, LOUISIANA, INC.
v.
ALL TAXPAYERS, PROPERTY OWNERS, CITIZENS OF the CITY OF GONZALES, State of Louisiana and of the Gonzales Economic Development District Number 1 and Non-Residents Owning Property or Subject to Taxation in Said City or District, and All Other Persons Interested in or Affected in Any Way by the Issuance of Not to Exceed $49,875,000 of Tax Increment Taxable and/or Tax-Exempt Revenue Bonds.
No. 2005-C-2298.
Supreme Court of Louisiana.
September 6, 2006.
Rehearing Denied October 13, 2006.
*13 Liskow & Lewis, Robert S. Angelico, Kelly B. Becker, K. Todd Wallace, Cheryl M. Kornick, New Orleans, for applicant.
Adams & Reese, David M. Wolf, Odas R. Cornelius, Thomas E. Gottsegen, New Orleans, Eric A. Holden; Dugas, LeBlanc & Associates, Malcolm J. Dugas, Jr; Percy & Percy, Robert R. Percy, III, for respondent.
James L. Ellis, Baton Rouge, for amicus curiae Baton Rouge Area Chamber et al., Ascension Chamber of Commerce, and Ascension Economic Development Corporation.
Walter R. House, Jr., for amicus curiae, Louisiana Department of Economic Development.
KIMBALL, J.
In this case we are called upon to determine whether the use of public funds pursuant to our tax increment financing laws to finance a private retail development is unconstitutional. Because we find the economic development project at issue does not violate the constitutional prohibition against the loan, pledge or donation of public property or the equal protection provisions of the federal and state constitutions, we affirm the judgment of the court of appeal.

FACTS AND PROCEDURAL HISTORY
To promote economic development, various entities of the City of Gonzales and the State of Louisiana made a decision to enter into several agreements and to issue tax increment revenue bonds to effectuate a project resulting in a Cabela's Retail Center and a Sportsman Park Center. Thus, the project involves the use of Tax Increment Financing as provided in La. R.S. 33:9038.1 et seq. (the "TIF Act").
On April 25, 2005, the governing authority of the City of Gonzales (the "City") adopted an ordinance creating an economic development district within the City, which was named the "Gonzales Economic Development District No. 1" (the "District.").[1] The District, which encompasses a 233-acre tract of land, is a political subdivision *14 of the state pursuant to La. R.S. 33:9038.2. Additionally, in furtherance of its goals to secure funding for economic development projects, the governing authority of the City sought a rededication of taxes previously authorized. On April 23, 2005, a special election was held wherein the voters of the City approved[2] the rededication of the one percent sales and use tax previously authorized on September 10, 1966, and the one-half percent sales and use tax previously authorized on April 1, 1989, for use by economic development districts created pursuant to the TIF Act to promote economic development in the City through the use of incremental increases in sales and use tax collected within the boundaries of the districts in addition to the previously authorized uses of the sales and use taxes.[3] Thereafter, several resolutions authorizing governmental entities to enter into various agreements with private entities to carry out and fund the project were passed.
The parties to the agreements are Cabela's Retail LA, LLC ("Cabela's"), Carlisle Resort, LLC ("Carlisle"), the Louisiana Department of Revenue ("State of Louisiana" or the "State"), the District, the City, and the Industrial Development Board of the City of Gonzales, Louisiana, Inc. (the "Board"). The agreements, or project documents, include a "Cooperative Endeavor Agreement," a "Trust Indenture," a "Lease Agreement with Option to Purchase," and a "Public Facilities Management Agreement." These project documents set forth the terms of the project, which will result in the following: (1) the acquisition of approximately 49.22 acres of real estate (the "Cabela's Property"); (2) the acquisition, development, construction and equipping of a Cabela's retail outlet and related infrastructure (the "Cabela's Retail Center") to be operated by Cabela's; (3) the construction of related public improvements and infrastructure needed to support the Cabela's Retail Center and the remaining portion of the Cabela's Property within the District; (4) the construction of a museum; and (5) the development *15 and construction of related public improvements and infrastructure needed to support the remaining approximate 48.5 acres within the District constituting the Sportsman Park Center (collectively, subsections (1) through (5) shall be referred to as the "Project").
Generally, the Cooperative Endeavor Agreement ("Agreement") provides that Cabela's will acquire 49.22 acres of property in the District from Carlisle and will construct, furnish and equip a 165,000 square foot retail facility, which will specialize in hunting, fishing, camping and outdoor gear. Cabela's also expects to cooperate with Carlisle in the development of other real estate in the District for complimentary retail and commercial ventures. Upon issuance of the bonds, Cabela's will transfer title of the Cabela's property and facilities to the Board. The Board will then enter into an agreement to lease the property and facilities to Cabela's, and the lease will contain an option to purchase. Cabela's will manage and maintain the Cabela's Retail Center, including the museum, pursuant to an agreement executed between Cabela's and the Board. Additionally, the Agreement states that Carlisle will develop 48.5 acres of its real estate as a Sportsman Park Center, which is located adjacent to the Cabela's Retail Center and within the District, for purposes of attracting certain complimentary retail and commercial ventures.
In order to finance the Project, the Board will issue tax increment revenue bonds in an amount not to exceed $49,875,000, which will be purchased by Cabela's and Carlisle. Specifically, the bonds will be purchased on a "pay-as-you-go" basis, and Cabela's will purchase up to $42,375,000 of the bonds while Carlisle will purchase up to $7,500,000 of the bonds.[4] Proceeds of the bonds will be advanced by Cabela's and Carlisle to the Board or the City on a pro-rata basis when needed to fund the construction to be paid with proceeds of the bonds. The payment of the bonds is secured by the annual pledged state increment, which amounts to 1.50% of State sales and use tax collected within the District up to a maximum total amount of $10,500,000, and the annual pledged local increment, which amounts to 1.50% of the City sales and use tax collected within the District.
In accordance with the requirements of the TIF Act, the State Bond Commission, on July 22, 2005, approved the issuance, sale and delivery of not more than $49,875,000 Tax Increment Revenue Bonds. Additionally, the State Bond Commission approved the form, execution and delivery of the Agreement. Both approvals were subject to and conditioned upon the Louisiana Joint Legislative Committee on the Budget approving the use of 1.50% sales and use tax from the State. The Joint Legislative Committee on the Budget gave its approval on August 12, 2005.
On July 27, 2005, the Board filed a Petition for Motion for Judgment pursuant to the Bond Validation Act seeking a judicial declaration of the validity and legality of the Project, the project documents and the bonds. Specifically, the Board prayed for a judicial determination approving: (1) the legality and validity of the bonds; (2) the legality and validity of all proceedings held and actions taken by the Board in connection with the authorization or issuance of the bonds; (3) the legality and validity of the project documents and all other documents executed in connection with the issuance of the bonds and all *16 terms and provisions contained therein; (4) the legality and validity of all proceedings held and actions taken by the Board in connection with the authorization and execution of the project documents and all other documents executed in connection with the bonds; (5) the exemption of the bonds and income therefrom from all taxation in the State in accordance with La. R.S. 33:9038.8; (6) the exemption of the Project from the Public Bid Law; and (7) the legality and validity of the rededication of the sales and use tax pledged to finance the bonds. The Board also asked the court to issue a permanent injunction against any person's institution of an action or proceeding contesting, among other things, the legality and validity of the bonds, the project documents, the pledges of revenue, and the legality and validity of the TIF Act and the Act's authorization of the project documents and transactions contemplated thereby.
On August 16, 2005, two Ascension Parish residents and sporting goods business owners of Ascension Parish, C.J. Hebert and Carl Singletary, filed a response to the Board's motion for judgment in which they asserted a peremptory exception of no cause of action. Therein, the defendants challenged the constitutionality of the TIF Act and the Agreement to the extent they allow public bodies to loan, pledge or donate public funds for uses other than the development and construction of infrastructure in connection with the Project. Specifically, they assert the TIF Act and the Agreement violate La. Const. art. VII, § 14 in this regard. Defendants also excepted to the Board's use of public funds to subsidize a particular retailer, and maintained that such action violated the Equal Protection Clauses of the federal and state constitutions because of its unequal treatment of similarly situated retail sporting goods stores.
Following a hearing on the motion for judgment at which documentary evidence was introduced, the trial court granted the motion, declared the TIF Act constitutional as applied to the Project, and denied the exception of no cause of action. The trial court declared that the actions of the Board relating to the issuance of the bonds, the Project, and the project documents were legal and valid. Defendants appealed the judgment of the trial court granting the Board's motion. The court of appeal affirmed the judgment of the trial court. Board of Dirs. of the Indus. Dev. Bd. of the City of Gonzales, Louisiana, Inc. v. All Taxpayers, 05-1935 (La.App. 1 Cir. 10/7/05), 929 So.2d 743. In reaching its determination, the court of appeal concluded that a bond issuance secured by the pledge of sales tax increments generated by the Project to fund the Project does not violate La. Const. art. VII, § 14(A). Defendants applied for a writ of certiorari from this court, which we granted. Board of Dirs. of the Indus. Dev. Bd. of the City of Gonzales, Louisiana, Inc. v. All Taxpayers, 05-2298 (La.1/27/06), 922 So.2d 525.

LAW AND DISCUSSION
Defendants' primary complaint in this court is that the Project and the TIF Act, to the extent it authorizes this Project, amounts to an unconstitutional donation of public funds to a private entity in violation of La. Const. art. VII, § 14. They also contend the Project violates the Equal Protection Clauses of the federal and state constitutions. At the outset, we note that defendants do not challenge the use of public funds for development and construction of the museum or the infrastructure needed for the Project. Rather, they object to the donation of public funds to a private retailer for its use in the development, construction and equipping of a retail store.
*17 Before addressing the constitutionality issue, we must first determine whether this matter may be disposed of on non-constitutional grounds. Denham Springs Econ. Dev. Dist. v. All Taxpayers, 04-1674, p. 5 (La.2/4/05), 894 So.2d 325, 330; Louisiana Associated Gen. Contractors, Inc. v. New Orleans Aviation Bd., 97-0752, p. 4 (La.10/31/97), 701 So.2d 130, 132. In Denham Springs, we pretermitted the constitutional issue of whether the TIF Act, to the extent that it allows the commitment of public funds to a private endeavor, violates La. Const. art. VII, § 14 because we found that taxing authorities cannot unilaterally and without the acquiescence of the voters use otherwise dedicated public funds to finance a project similar to the one at issue in this matter. Unlike the situation presented in Denham Springs, however, the voters in this case have approved the rededication of previously authorized taxes such that certain revenues may now be used by economic development districts to promote economic development in the City. Consequently, the parties do not allege, and we do not detect, any non-constitutional grounds upon which this case may be resolved, and we turn our attention to the TIF Act itself.
Tax increment financing is a tool used to finance the redevelopment of economically depressed areas without causing any additional tax burden on local taxpayers. Alan C. Weinstein & Maxine Goodman Levin, Tax Increment Financing, in 6 ZONING AND LAND USE CONTROLS, ch. 33B, p. 33B-3 (Eric Damian Kelly, ed., Matthew Bender & Co. 2006). This type of financing originated in California in 1952 as a means to provide local matching funds for federal grants. Id. As funds for redevelopment became scarce, other states passed tax increment financing laws as the primary funding vehicle for local redevelopment projects. Id. See also John Grand, Comment, Tax Increment Financing: Louisiana Goes Fishing for New Business, 66 La.L.Rev. 851, 854-55 (2006). Presently, almost every state has enacted tax increment financing laws. J. Drew Klacik & Samuel Nunn, A Primer on Tax Increment Financing, in TAX INCREMENT FINANCING AND ECONOMIC DEVELOPMENT: USES STRUCTURES, AND IMPACTS, ch. 2 (Craig L. Johnson & Joyce Y. Man, eds., State Univ. of New York Press 2001).
In Louisiana, tax increment financing is authorized by the state's Cooperative Economic Development Law. La. R.S. 33:9020. The Cooperative Economic Development Law was passed to aid local governmental subdivisions in alleviating the conditions of unemployment, underemployment, and other forms of economic distress presently existing in their areas. La. R.S. 33:9021. In passing this Law, the legislature found that while economic development serves the public interest, it is not solely a public purpose because successful economic development also serves the private interests of business and industry. Id. The legislature further found that public-private partnerships that take advantage of the special expertise of the private sector are among the most effective programs to encourage and maintain economic development, and that it is in the best interest of the State and its local governments to encourage, create, and support public-private partnerships. Id.
The TIF Act allows both ad valorem tax increment financing and sales tax increment financing. The instant case involves sales tax increment financing pursuant to La. R.S. 33:9038.4, which authorizes the District to issue revenue bonds to finance economic development projects. The bonds are payable "from revenues generated by economic development projects with a pledge and dedication of up to the full amount of sales tax increments annually to be used as a guaranty of any *18 shortfall...." La. R.S. 33:9038.4(A)(1). A "sales tax increment" is defined as:
that portion of the designated sales tax, hereinafter defined, collected each year on the sale at retail, the use, the lease or rental, the consumption and storage for use or consumption of tangible personal property, and on sales of services ... from taxpayers located within an economic development district which exceeds the designated sales tax revenues and hotel occupancy taxes, occupancy taxes, or similar taxes so designated that were collected in the year immediately prior to the year in which the district was established.
La. R.S. 33:9038.4(A)(2). In the instant case, there was no sales tax collected within the boundaries of the District in the year immediately prior to the year in which the District was established. City of Gonzales Resolution # 2753 (July 18, 2005). Consequently, the sales tax increment consists of all the sales taxes that will be collected within the District.
The statute directs that the revenue bonds be issued to finance all or part of an economic development project as described in La. R.S. 33:9038.4 and La. R.S. 33:9038.6. La. R.S. 33:9038.4(M) provides:
For the purposes of this Section, the term "economic development project" shall mean and include, without limitation, any and all projects suitable to any industry determined by the local governmental subdivision or, as appropriate, the issuers of revenue bonds, to create economic development. Economic development projects shall include, without limitation, public works and infrastructure and projects to assist the following industries within the meaning of Article VI, Section 21 of the Louisiana Constitution:
(1) Industrial, manufacturing, and other related industries.
(2) Housing and related industries.
(3) Hotel, motel, conference facilities, and related industries.
(4) Commercial, retail, and related industries.
(5) Amusement, places of entertainment, theme parks, and any other tourism-related industry.
(6) Transportation-related industries.
(7) Hospital, medical, health, nursery care, nursing care, clinical, ambulance, laboratory, and related industries.
(8) Any other industry determined by the local governmental subdivision or issuer of revenue bonds, as appropriate, whose assistance will result in economic development.
Thus, subsection (M) provides that an "economic development project" includes without limitation any project in any industry that a local governmental subdivision determines will create economic development. The subsection goes on to illustrate that economic development projects shall include without limitation public works and infrastructure and projects to assist commercial and retail industries within the meaning of La. Const. art. VI, § 21. Generally, La. Const. art. VI, § 21, entitled "Assistance to Local Industry," provides that in order to induce and encourage the location of industrial enterprises that would have economic impact upon the area and thereby the state, the legislature may authorize any political subdivision to issue bonds to finance the acquisition and improvement of industrial plant sites and other property necessary to its purposes and to then lease the property.[5] The plain *19 language of La. R.S. 33:9038.4(M) clearly indicates the legislature intended a broad interpretation of type of project that could be financed by bonds secured by sales tax increments.
Additionally, La. R.S. 33:9038.6 explains which costs of an economic development project incurred by the local governmental subdivision may be included under the TIF Act. The statute states that the allowable costs include "the sum total of all reasonable or necessary costs incurred incidental to or in furtherance of an economic development project ... providing that any such costs are reasonably related or attributable to an approved economic development plan." It goes on to illustrate the types of costs contemplated, such as property acquisition, on-and off-site preparation costs, costs of renovation and repair of any existing buildings and improvements, and costs of construction.
Defendants argue that the Project at issue is outside the scope of the type of "economic development project" contemplated by the TIF Act because it goes beyond "assisting" the development of private business and results in a direct handout to private business. We disagree with this view. As explained above, the TIF Act allows the public financing of any project in any industry that the local governmental subdivision has determined will create economic development. Here, the District has decided that the Project outlined in the Agreement will create economic development. The second sentence of the definition provided by La. R.S. 33:9038.4(M), which provides that economic development projects shall include without limitation public works, infrastructure and projects to assist commercial and retail industries, illustrates the types of projects and industries that may be induced and encouraged, as contemplated by La. Const. art. VI, § 21, by the public financing, but is not an exhaustive or exclusive list of the allowable projects. In light of the plain and broadly inclusive language utilized in the statute, we conclude that the legislature intended the TIF Act to be utilized for a project such as the one presented in this case.
Finding that the Project is authorized by the TIF Act, we now turn to defendants' allegation that the Project's financing structure amounts to an unconstitutional loan, pledge, or donation in violation of La. Const. art. VII, § 14. At the outset, we recognize that in the exercise of the legislative power of the state, *20 the legislature may enact any legislation that the state constitution does not prohibit. Louisiana Ass'd Gen. Contractors, Inc. v. Louisiana Dept. of Agriculture & Forestry, 05-0131, p. 14 (La.2/22/06), 924 So.2d 90 100; World Trade Ctr. Taxing Dist. v. All Taxpayers, 05-0374, p. 11 (La.6/29/05), 908 so.2d 623, 632. When an opponent raises a constitutional challenge, the question is whether the constitution limits the legislature, either expressly or impliedly, from enacting the statute at issue. World Trade Ctr. Taxing Dist., 05-0374 at p. 12, 908 So.2d at 632.
As with any challenge that alleges a constitutional violation, the starting point of our analysis must be the constitutional provision itself. Louisiana Mun. Ass'n v. State, 00-0374, p. 5 (La.10/6/00), 773 So.2d 663, 667. La. Const. art. VII, § 14(A) provides:
Except as otherwise provided by this constitution, the funds, credit, property, or things of value of the state or of any political subdivision shall not be loaned, pledged, or donated to or for any person, association, or corporation, public or private. Except as otherwise provided in this Section, neither the state nor a political subdivision shall subscribe to or purchase the stock of a corporation or association for any private enterprise.
Subsection (B) of the Article provides numerous specific exceptions to subsection (A). Subsection (C), which states that "[f]or a public purpose, the state and its political subdivisions or political corporations may engage in cooperative endeavors with each other, with the United States or its agencies, or with any public or private association, corporation, or individual," authorizes cooperative endeavors among the stated entities, but does not serve as an exception to subsection (A). City of Port Allen, Louisiana v. Louisiana Mun. Risk Mgmt. Agency, Inc., 439 So.2d 399, 402 (La.1983).
The starting point in the interpretation of constitutional provisions is the language of the constitution itself. East Baton Rouge Parish Sch. Bd. v. Foster, 02-2799, p. 15 (La.6/6/03), 851 So.2d 985, 996. When a constitutional provision is plain and unambiguous and its application does not lead to absurd consequences, its language must be given effect. Id. Unequivocal constitutional provisions are not subject to judicial construction and should be applied by giving words their generally understood meaning. Cajun Elec. Power Co-op. v. Louisiana Pub. Serv. Com'n, 544 So.2d 362, 363 (La.1989) (on rehearing).
The constitutional provision at issue prohibits the loan, pledge or donation of public property. La. Const. art. VII, § 14(A). Because it does not define loan, pledge or donation, we must first determine exactly what the constitution intends to prohibit in Article VII, § 14(A).
The term donation, as used in La. Const. art. VII, § 14(A), is plain and unambiguous. The generally understood meaning of a donation is an act whereby one gratuitously gives something to another. The term donation contemplates giving something away. It is a gift, a gratuity or a liberality. We find that, essentially, the constitutional provision at issue seeks to prohibit a gratuitous alienation of public property.
Several considerations justify this interpretation in addition to the generally understood meaning of the term. This concept of donation is consistent with the delegates' understanding of donation as an act of giving away public property, as evidenced by the convention transcripts, in which the delegates state that the provision at issue prohibits a municipality from buying land on which an industry could construct a building and "just giv[ing] it to *21 them." See Records of the Louisiana Constitutional Convention of 1973: Convention Transcripts, Vol. IX, p. 2897.[6]
The concept of a donation as a gift, gratuity or liberality also comports with prior jurisprudence of this court. See Johnson v. Marrero-Estelle Volunteer Fire Co. No. 1, 04-2124, p. 10 (La.4/12/05), 898 So.2d 351, 359 (concluding the payment of certain sick leave benefits at issue is not a loan, pledge or donation because it is "not a gift"); City of Port Allen, Louisiana v. Louisiana Mun. Risk Mgmt. Agency, Inc., 439 So.2d 399, 402 (La.1983) (equating donation with gratuity). One commentator has defined the constitution's reference to the term donation as a gratuitous act in light of the course of the caselaw, which "has been to give a narrow definition of the term donation in keeping with the traditional civil code concepts going back to pre-statehood days. A donation is currently defined as a gratuitous act, one which is made without condition and merely from liberality." Lee Hargrave, Limits on Borrowing and Donations in the Louisiana Constitution of 1975, 62 La.L.Rev. 137, 157 (2001) (internal quotation omitted).
Under the Civil Code, there are three types of donations: gratuitous, onerous, and remunerative. A contract is gratuitous when one party obligates himself towards another for the benefit of the latter, without obtaining any advantage in return. La. C.C. art. 1910. See also La. C.C. arts. 1772-73 (1870). Gratuitous donations are those made without condition and merely from liberality. La. C.C. art. 1523. See also La. C.C. art. 1523 (1870). Onerous donations, those burdened with charges imposed on the donee, and remunerative donations, those in recompense for services rendered, are "not real donations" under the Code, however, if the value of the object given does not manifestly exceed that of the charges imposed on the donee or if the value of the services to be recompensed thereby being appreciated in money, should be little inferior to that of the gift, respectively. La. C.C. arts. 1523, 1524 & 1525. The mere fact that the donee rendered services to the donor does not necessarily require that a donation be classified as either onerous or remunerative instead of gratuitous. Whether the donor had the requisite intent is determinative. If gratitude and love, instead of an intent to impose or a desire to remunerate, motivated the donor, the donation is gratuitous, subject to the rules peculiar to donation inter vivos. Frederick William Swaim, Jr. & Kathryn Venturatos Lorio, 10 LOUISIANA CIVIL LAW TREATISE, SUCCESSION AND DONATIONS § 9.13 at 228 (1995).
The generally understood meaning of the term donation correlates with gratuitous *22 donations as defined by the Civil Code, and we believe the constitution's use of the term envisions a gratuitous intent. Numerous commentators have equated the term "donation" with a gratuitous donation, intertwining the concept of gratuitous intent into discussions of donations. According to Planiol, "Any transaction through which some right is assigned without the demand for a counter-performance is a donation. It is an intentional procurement of a gratuitous enrichment." 3 Marcel Planiol, TREATISE ON CIVIL LAW § 2543(A) (La. State Law Inst. trans., 11th ed.1959). "In gratuitous contracts, where there is neither reciprocity of obligations, nor prior performances, the `cause' of the obligation of the donor can only be found in the motives of liberal intention." Id. at § 1030 (analyzing the ideas of Domat). The concept has also been stated as, "A gratuitous act is that whereby a person confers or engages to confer upon another an advantage without receiving from him, or without having been promised by him, an advantage that would constitute the counterpart thereof, so that his act is intentionally gratuitous." 3 Aubry & Rau, CIVIL LAW TRANSLATIONS, Testamentary Successions and Gratuitous Dispositions, § 644 (1969).
Similarly, the constitutional prohibition against loaning public property also contemplates giving away public funds. A loan differs from donation because a loan requires a promise to return the property or repay the funds in the future. The Convention transcripts reveal that the delegates discussed the word "loan" in conjunction with the word "borrow." Ultimately, the delegates recognized that it would be illogical to substitute the word borrow for loan because the terms represent opposite sides of the same transaction. Thus, if the state loans public funds to an individual, then the individual borrows the funds from the state. Records of the Louisiana Constitutional Convention of 1973: Convention Transcripts, Vol. IX, p. 2897 (stating, "It's a question of loaned by whom and to whom."; "Wouldn't it be illogical to substitute the word borrow in that place because we're not talking about borrowing public funds?"; "That's what the word `loan' refers to, as loaning public funds."). Nevertheless, the delegates used the word borrow in describing what is meant by loan. The notion of loaning refers to a gratuitous alienation of public property coupled with a promise of return. See La. C.C. art. 2891 ("The loan for use is a gratuitous contract by which a person, the lender, delivers a nonconsumable thing to another, the borrower, for him to use and return.").
The underlying concept underlying the prohibition of the loan and donation of public funds is one of gratuitous intent. Defendants, however, point to this court's decision in City of Port Allen for the application of an alternative test that is based upon a public entity's legal obligation to give up something of value. In City of Port Allen, we recognized that then, as now, there was little jurisprudence interpreting the meaning of the prohibition in § 14(A). Nevertheless, we went on to state:
The cases that do exist hold primarily that this section is violated whenever the state or a political subdivision seeks to give up something of value when it is under no legal obligation to do so. See, e.g., Town of Brusly v. West Baton Rouge Parish Police Jury, 283 So.2d 288 (La.App.), writ denied, 284 So.2d 776 (La.1973) (police jury's attempt to reallocate monies from its surplus to municipalities within the parish held unconstitutional); Beaird-Poulan, Inc. v. Louisiana Department of Highways, 362 F.Supp. 547 (W.D.La.1973) (state could not constitutionally pay relocation *23 expenses when jurisprudence did not permit them and when constitutional amendment allowing them had not yet gone into effect). But see Morial v. Orleans Parish School Board, 332 So.2d 503, 505 (La.App.), writ denied, 337 So.2d 530 (La.1976) (R.S. 17:1201-12, which provides a formula for discovering the amount to be paid a teacher who is absent on sick leave for a period in excess of her accumulated sick leave days, held constitutional as a "legislatively created benefit, earned by virtue of the employment itself.").
City of Port Allen, 439 So.2d at 401-02.
In considering this analysis, we find little support for the proposition that § 14(A) is violated when the State or a political subdivision seeks to give up something of value when it is under no legal obligation to do so. The cases cited by the court in City of Port Allen are neither persuasive nor particularly applicable. Additionally, the analysis seems unworkable because the State and its political subdivisions often, and without apparent constitutional violation, enter into contracts to buy goods, such as office supplies, without being under a legal obligation to do so. We agree with the criticism of a distinguished commentator:
Another problematic issue stemming from the Port Allen analysis is the court's statement that the constitutional provision is violated "whenever the state or a political subdivision seeks to give up something of value when it is under no legal obligation to do so." That statement can make no sense without distorting the meaning of the words. The state obviously can give up funds to buy things even though it has no legal obligation to buy the thing. The state can invoke its credit to borrow money even though it has no obligation to borrow. Looking at the authorities the court cites to support its statement, it appears they were not on point, but dealt with intergovernmental transfers of funds and payment of moving expenses to owners of expropriated property. And of course, governments can make donations under any of the exceptions stated in Section B even if those are discretionary rather than being compelled. It probably would be simpler to analyze these matters in the traditional system used by the civil code since before statehood  donations are transfers based on a gratuitous cause as opposed to an onerous one. The Port Allen risk management scheme was not based on a gratuity but on a system for uniting to generate greater leverage to secure insurance and self insurance management.
Hargrave at 155-56 (footnotes omitted).
The statement in City of Port Allen that § 14(A) is violated "whenever the state or a political subdivision seeks to give up something of value when it is under no legal obligation to do so" presents an unworkable and incorrect interpretation of La. Const. art. VII, § (A). Consequently, we repudiate that interpretation of § 14(A). We find instead that § 14(A) is violated when public funds or property are gratuitously alienated.
La. Const. art. VII, sec. 14(A) also prohibits the pledge of public funds. Nevertheless, the prohibition against pledging the credit of the state or political subdivisions have been held to apply only to debts secured by the full faith and credit of the state. Hargrave at 150. See also State Bond Comm'n v. All Taxpayers, 510 So.2d 662, 664-66 (La.1987). Bonds secured by specified, limited revenue sources are therefore allowable and are not in contravention of La. Const. art. VII, § 14(A). Moreover, the Constitution authorizes the legislature to create "special districts, boards, agencies, commissions, and authorities *24 of every type" and to grant them "the power to incur debt and issue bonds." La. Const. Art. VI, § 19. See Board of Dir. of the Louisiana Recovery Dist. v. All Taxpayers, 529 So.2d 384, 388-90 (La.1988). Here, the legislature created the District and granted it the power to issue bonds, as sanctioned by the constitution.
Applying these principles to the facts of the instant case, we conclude the Project does not constitute a prohibited loan, pledge or donation of public funds. The project documents clearly state that the bonds are not secured by the full faith and credit of the state or of any political subdivision. The documents clearly reveal that both the State and the City have not entered into the obligations at issue gratuitously. Clearly, both parties expect to receive something of value in return for the performance of their obligations. As evidence of the non-gratuitous intent of the public parties, the Agreement contains a provision that states unequivocally:
The City and State have determined that the Project serves a public purpose and that, based solely on financial projections and other information provided to it by the [District], the Annual Pledged Local Increment and the Annual Pledged State Increment pledged and dedicated hereby, collectively is less than the financial benefits to be received by each as a result of the Project.
Additionally, the Agreement also contains a provision wherein the State's expectations are specified as follows:
The State hereby acknowledges that there is a reasonable expectation that the Project will result in economic development within the State which will exceed the value of the obligations of the State contained herein thereby serving a public purpose.
In the absence of any other evidence, these statements, standing alone, would be insufficient to allow us to conclude a non-gratuitous intent on the parts of the State and the City. Taken as parts of the Agreement and related documents as a whole, however, they provide insight into the intent of the parties, and reveal that neither the State nor the City intend to enter into a gratuitous contract with Cabela's and Carlisle.
Furthermore, the property comprising the District is not currently providing the State and the City with any sales tax revenues. If the Project is successful, significant sales tax revenues will be generated. Although the State and the City have each pledged 1.50% of their portion of the sales taxes collected within the District, the State sales tax rate is 4% and the City sales tax rate is 2%. Thus, from the beginning of the Project, it appears that 2.50% the sales taxes collected by the State and 0.50% of the sales taxes collected by the City are not pledged to finance the bonds. Consequently, it seems that from the first sale made at the Retail Center, the State and the City will collect sales tax revenues that are not pledged to finance the bonds. These revenues would not otherwise have been collected without the cooperation of the parties to the Project.
The non-gratuitous nature of the Project is also plainly demonstrated by the obligations imposed by the project documents upon Cabela's and Carlisle in exchange for the State's and City's participation in the Project. In exchange for the obligations undertaken by the public parties, Cabela's will acquire the 49.22 acres upon which its Retail Center will be built. It will then construct, furnish and equip the retail center. When the bonds are issued, Cabela's will transfer title of the property and facilities located on the property to the Board, which will then lease the property and facilities to Cabela's.
*25 For its part, Carlisle is obligated to develop 48.5 acres of its property located adjacent to the Cabela's Retail Center for purposes of attracting complimentary businesses, such as restaurants, movie theaters, hotels, water parks, and other retail businesses. Carlisle must complete development of the entire Sportsman Park Center by September 30, 2009.
The Agreement provides that Cabela's and Carlisle agree that they will have "no recourse against the State, the City, the [Board], the [District] or any portion of the Project in the event the Annual Pledged State Increment and the Annual Pledged Local Increment shall be less than the debt service on the Bonds, or for any other matter arising from or relating to the Bonds and Cabela's [and Carlisle] ... shall indemnify, defend and hold harmless the State, the City, the [Board] and the [District] from any and all such claims." Cabela's and Carlisle are financing the Project up front with the purchase of the bonds. Thus, from the outset, Cabela's and Carlisle will be risking an appreciable amount of their own assets. Additionally, the bonds are payable solely from the Annual Pledged State and Local Increment, which means that if the Project generates low sales, payments on the bonds may not be made. Furthermore, the Agreement provides that Cabela's will be responsible for financing the completion of the retail center for all amounts in excess of the proceeds of the bonds if the bond proceeds are insufficient to cover the expenses for the retail center. This provision also places Cabela's finances at risk, especially for overages or if an unexpected event occurs during the completion of the Center because Cabela's would be required to complete the Retail Center regardless of the availability of bond proceeds.
Under the Agreement, Cabela's is obligated to ensure that the Retail Center remains in continuous operation until the Annual Pledged State Increment has been paid in full or a period of five years has elapsed, whichever is longer. Furthermore, Cabela's and Carlisle are obligated to use reasonable best efforts to purchase materials and equipment from businesses located in the City. It is also obligated to use reasonable efforts to employ residents of the City. It is anticipated these provisions will stimulate the local economy and undoubtably constitute one of many reasons the State and City have elected to participate in the Project.
The State's contribution of the Annual Pledged State Increment is contingent upon Cabela's employment of at least 300 full- and part-time workers at the prevailing wage rate and with the health insurance benefits typically provided to Cabela's employees. If Cabela's hires only between 200 and 300 employees, it waives receiving payment on the bonds in the amount of $5,000 for each job it failed to create. If it hires fewer than 200 employees, the State's payment of its Increment shall cease. These provisions indicate that the Project will bring important and substantial employment opportunities for the citizens of Louisiana, a benefit that surely motivated the State's and the City's decisions to participate in the Project.
The management agreement generally provides that Cabela's will be responsible for managing the public facilities, including the museum, which shall include maintenance and repairs, with the obligation to expend its own funds for the proper maintenance and repair. Cabela's is obligated to keep accurate account of its expenditures, to operate the museum pursuant to specified guidelines, and to employ personnel to properly maintain the public facilities. In exchange for these duties, Cabela's will be entitled to recover its actual *26 costs arising out of the operation, maintenance and repair of the public facilities, with payment of these costs plus interest being deferred until Cabela's exercises its option to purchase the property in accordance with the lease agreement.
The lease agreement also mandates that Cabela's perform several obligations. Cabela's is obligated to pay rent equal to the actual amount of ad valorem taxes that would be owed if Cabela's itself owned the premises.[7] Additional rents, in the form of all costs for insurance, maintenance, and improvements, are provided for by the lease agreement. Specifically, Cabela's must purchase builders' risk insurance, general liability and property damage insurance during the period of construction, and property damage and comprehensive general public liability insurance upon completion. In addition to the rents discussed above, Cabela's will pay personal property taxes on the equipment and inventory located on the premises. Cabela's will also indemnify the lessor against all liability, claims and suits connected with its use and management of the premises. The lease further provides that Cabela's will contract and pay for all utility services supplied to the premises. Regarding maintenance, the lease obligates Cabela's, at its cost, to repair, maintain and replace all necessary capital improvements to the leased premises. Additionally, Cabela's, at its cost, must make all other necessary and routine maintenance and repairs to the leased premises that are not otherwise provided for in the Management Agreement.
The lease agreement provides Cabela's an option to purchase the leased premises at the earlier of the expiration or payment in full of the Cabela's bonds. The purchase price of the leased premises would be the fair market value of the leased premises on the date Cabela's exercises its option to purchase. Cabela's would be allowed to take as a credit against the purchase price an amount equal to (1) the amount it paid for the property before it was transferred to the Board; (2) all rent paid by Cabela's to the Board during the lease term; (3) all additional rent paid by Cabela's during the lease term; (4) $2,500 for each full-time job and $1,250 for each part-time job created by Cabela's at the Retail Center; (5) $1,900,000 for each year that Cabela's operated the Retail Center during the Lease; and (6) any amount owed to Cabela's, including the Accrued Management Compensation provided for by the Management Agreement. It is stipulated that in the event these purchase price offsets exceed the purchase price, Cabela's will waive any right to collect the excess from the Board. If the purchase price exceeds the offsets, Cabela's will pay the Board the difference.
As detailed above, the management and lease agreements impose significant obligations upon Cabela's. Cabela's must pay a definite and substantial rent to the Board. The fact that the additional rents will be paid directly to third parties who provide the services appears insignificant because the Board, as owner, will receive the benefit of the payments and will not incur any administrative costs in paying the bills itself as it would if the payments were made directly to it. Furthermore, the management of the public facilities *27 imposes upon Cabela's actual and appreciable obligations. Likewise, the fact that Cabela's will be paid a deferred management fee in the form of additional credits should it exercise the option to purchase does not negate Cabela's obligation to provide actual maintenance and repair services to the property.
The existence of the purchase price offsets that could conceivably result in no money exchanging hands if and when the property is sold to Cabela's does not negate the existence of the obligations imposed upon Cabela's during the terms of the lease agreement to render it a gratuitous contract. First, it is not certain that Cabela's will exercise its option to purchase the property and collect the offsets. Practically speaking, it is doubtful that Cabela's will exercise the option to purchase if the Project is not a long-term success. Even if Cabela's does choose to exercise the option to purchase, it is obligated to perform varied and substantial duties during the life of the assorted agreements. These reciprocal obligations on the part of Cabela's are not somehow retroactively diminished when the option to purchase is exercised, rendering a once-onerous contract a newly gratuitous contract. Furthermore, the purchase price offset for each job created by the Project is well below the expenses and costs of each employee hired and retained by Cabela's. Although Cabela's will receive a $2,500 credit for each full-time job it creates at the Retail Center, it will undoubtedly pay far more in salary, benefits, training, and expenses for that full-time employee.
In light of real and substantial obligations undertaken by Cabela's in exchange for the tax increment financing, we conclude the financing scheme of the Project is not gratuitous on the part of the parties. Consequently, we do not find that the Project includes a loan or donation of public funds to a private retailer in violation of La. Const. art. VII, § 14(A). Similarly, the Project does not constitute a prohibited pledge of public funds. Because we find no violation of subsection (A), we need not consider the existence of any exception provided by subsection (B) or elsewhere in the constitution.
Defendant's reliance on the fact that the legislature has made six unsuccessful attempts to amend the constitution to include economic development and/or industrial projects as an exception to § 14(A) is misplaced. This particular Project, while certainly an economic development project, does not envision a prohibited loan, pledge or donation of public property so an economic development exception, even if it did indeed exist, would be unnecessary. Such an exception would allow a public entity to enter into an agreement to donate, or give away, public funds for purposes of economic development with no reciprocal obligations imposed upon the other party in exchange for the public funds. This is not the case presented here. Cf. footnote 6. Moreover, the failure of the proposed constitutional amendments to except economic development from § 14(A) does not mean that the economic development Project at issue violates the prohibition against loaning, pledging or donating public funds. The voters could have rejected the amendments because they did not believe such an exception was necessary, or because they disagreed with the precautionary nature of the amendment, see e.g. Orleans Parish Sch. Bd. v. Louisiana State Bd. of Educ., 215 La. 703, 41 So.2d 509, 517 (1949), or because they simply disagreed that economic development should be an exception to the prohibition. In this context, the failure of the proposed amendments does not dictate a contrary interpretation of La. Const. art. VII, § 14(A).
*28 Defendants also challenge the constitutionality of the TIF Act and the Project on equal protection grounds. They argue that there is no rational basis for the handout of public funds to Cabela's, a private retailer, to the detriment of other previously existing retailers. Defendants contend that they have already borne the costs of acquiring their buildings and equipping their stores, while the public will bear similar costs for Cabela's. They assert this disparity will result in an unfair advantage for Cabela's.
As an initial matter, we note that defendants' businesses have not attempted to avail themselves of the provisions of the TIF Act and, consequently, have not been denied tax increment financing. Nonetheless, it is settled that "[u]nder the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, in areas of social and economic policy, a statutory classification which does not proceed along suspect or semi-suspect lines, nor infringe on fundamental rights, need only be rationally related to a legitimate governmental interest." Med Express Ambulance Serv. Inc. v. Evangeline Parish Police Jury, 96-0543, pp. 7-8 (La.11/25/96), 684 So.2d 359, 365; Police Ass'n of New Orleans v. City of New Orleans, 94-1078, p. 11 (La.1/17/95), 649 So.2d 951, 960-61. When an economic regulation is challenged as being violative of the Equal Protection clause, "this court may not sit as a super-legislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines. In the local economic sphere, it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with the Fourteenth Amendment." Lakeside Imports, Inc. v. State, 94-0191, p. 6 (La.7/5/94), 639 So.2d 253, 257.
Under the Equal Protection Clause found in La. Const. art. I, § 3, a court must decline enforcement of a legislative classification of individuals in three different situations:
(1) When the law classifies individuals by race or religious beliefs, it shall be repudiated completely;
(2) When the statute classifies persons on the basis of birth, age, sex, culture, physical condition, or political ideas or affiliations, its enforcement shall be refused unless the state or other advocate of the classification shows that the classification has a reasonable basis; and
(3) When the law classifies individuals on any other basis, it shall be rejected whenever a member of a disadvantaged class shows that it does not suitably further any appropriate state interest.
State v. Expunged Record (No.) 249,044, 03-1940, p. 9 (La.7/2/04), 881 So.2d 104, 110. Classifications based on race or religious beliefs are absolutely forbidden. Id. When the second situation is present, a statute is unconstitutional unless the proponents of the statute prove that the classification substantially furthers an appropriate state purpose. Id. at p. 10, 881 So.2d at 110. Under the third situation, the burden shifts to the challenger of the statute who must demonstrate that the statute fails to serve a legitimate government purpose when the challenged classification is based on grounds other than birth, race, age, sex, social origin, physical condition, or political or religious ideas. Id. at p. 10, 881 So.2d at 111.
In the instant case, we find defendants have failed to establish the existence of an equal protection violation. The TIF Act, a measure concerned with economic regulation, was enacted to promote economic development, which serves private businesses as well as the public interest. As such, it is rationally related to legitimate governmental *29 interests. The Act does not result in arbitrary discrimination. Similarly, defendants have not shown that the Act fails to serve a legitimate government purpose. The promotion of economic development, which ultimately serves the public as a whole, is a legitimate governmental goal. For all these reasons, we reject defendants' constitutional challenges based on equal protection arguments.

CONCLUSION
For all the above reasons, we find that neither the TIF Act, as applied in this case, nor the Project at issue violate La. Const. art. VII, § 14(A). Similarly, we find defendants did not prove the existence of an equal protection violation. Therefore, we reject the constitutional challenges presented by defendants and affirm the judgment of the court of appeal.
AFFIRMED.
TRAYLOR, J., dissents and assigns reasons.
KNOLL, J., dissents for the reasons assigned by TRAYLOR, J.
TRAYLOR, Justice, dissenting.
I respectfully dissent from the majority's finding that the financing structure set forth in this proposed development project is a constitutionally permissible use of public funds by a governmental entity. Moreover, I agree with defendants' proposition that the Project's financing structure amounts to a donation of public funds in violation of Article VII, Section 14(A) of the Louisiana Constitution which prohibits the loan, pledge or donation of anything of value belonging to the state or a political subdivision.
As with any challenge which suggests a possible constitutional violation, the starting point must be the constitutional provision itself. Louisiana Mun. Ass'n v. State, 00-0374, p. 5 (La.10/6/00), 773 So.2d 663, 667. When interpreting a constitutional provision, the "starting point" is with the language of the provision. Touchard v. Williams, 617 So.2d 885 (La. 1993).
Louisiana Constitution Article VII, Section 14(A) provides:
except as otherwise provided by this constitution, the funds, credit, property, or things of value of the state or of any political subdivision shall not be loaned, pledged, or donated to or for any person, association, or corporation, public or private. Neither the state nor a political subdivision shall subscribe to or purchase the stock of a corporation or association for any private enterprise.
"Constitutional provisions are subject to the same rule of interpretation and construction as are applicable to other laws." Louisiana Dept. of Agriculture and Forestry v. Sumrall, 98-1587, p. 5(La.3/2/99), 728 So.2d 1254, 1258 citing Orleans Parish School Board v. Murphy, 156 La. 925, 101 So. 268; 11 American Jurisprudence 658, Constitutional Law, § 49; 16 C.J.S. Constitutional Law, § 15, p. 51. Explicit constitutional provisions are not subject to judicial construction and should be applied by giving words their generally understood meaning. State through Dept. of Highways v. Bradford, 242 La. 1095, 141 So.2d 378 (1962). When a constitutional provision is plain and unambiguous, its language must be given effect. Civil Service Com'n of City of New Orleans v. City of New Orleans, 02-1812, p. 10 (La.9/9/03), 854 So.2d 322, 330. When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent. La. Civ.Code art. 9; Cat's Meow, Inc. v. City of New Orleans, 98-0601, *30 p. 15 (La.10/20/98), 720 So.2d 1186, 1198.
The words contained in Article VII, Section 14(A) of the Louisiana Constitution are clear and unambiguous. Interpreting the words, using their ordinary meaning, it is clear that this constitutional provision prohibits the loan, pledge or donation of anything of value belonging to the state or political subdivision. I find no ambiguity in this provision, for the meaning is easily ascertained from the plain language of the provision. Unless another provision of our constitution allows such action, any use of public funds or property which falls within one of these three categories, i.e. loan, pledge or donation, violates this provision of the constitution. No other meaning could be ascertained from the plain text of the article. Thus, since the language of Article VII, Section 14(A) is clear and unambiguous, I find it unnecessary to search any further for the intent of those who drafted the provision. La. Civ.Code art. 9. Consequently, it is unnecessary to explore the debates of the drafters and I believe that we should instead rely on the ordinary meaning of the words as they appear in the text of the article. Bank of New Orleans and Trust Co. v. Seavey, 383 So.2d at 356; City of New Orleans v. Scramuzza, 507 So.2d 215, 217 (La.1987); Chamberlain v. State Through Dept. of Transp. and Development, 624 So.2d 874, 886 (1993).
As the majority recognizes, there have been a limited number of cases in which this court has been called upon to consider challenges to actions of the state or political subdivisions premised on a violation of Article VII, Section 14(A). Albeit limited, I believe that our prior decisions interpreting this constitutional provision instructive and germane to our analysis of this case.
In State v. Board of Com'rs of Port of New Orleans 96 So. 510, 153 La. 664, (La.1923), this court considered whether the board of commissioners of the Port of New Orleans could lawfully sublease public property to a private entity. The court explained the history surrounding the original lease of the wharf and wharfhouse from the United States Government, which was necessary to the understanding of the value of the leased property.[1] Included in the original lease was a warehouse, which the board did not need, but was nevertheless required to lease as a part of the agreement with the government. Three months after signing the lease with the government, a fire destroyed a considerable portion of the wharf and wharfhouse, thus the board of commissioners had little use for the land. The only usable portion of the leased property was the warehouse, which the board of commissioners sought to sublet to a private entity to help defray the lease payments, and, incidentally, to bring more business to the port.[2]
The Louisiana Attorney General objected to the board of commissioners' attempt to enter into a contract of lease with a private entity. The Attorney General maintained that the board's action was in *31 violation of Article IV, Section 12 of the 1921 Louisiana Constitution which prohibited the loan, pledge or grant of any funds, credit, or thing of value, of the state or of any political corporation, to any person or persons, or corporation, public or private.[3] This court rejected the argument, finding "the proposed sublease is not within the meaning of the constitutional mandate, a loan, pledge, or grant, of any fund, credit, or thing of value, of the state or of the dock board. The right of occupancy of the warehouse is not now of any value to the state, or to the dock board, except for the right to sublease it and collect the rent." State v. Board of Com'rs of Port of New Orleans, 96 So. at 512. The court concluded that there existed no impediments to the board entering into the lease agreement.
In City of New Orleans v. Disabled American Veterans, 223 La. 367, 65 So.2d 796 (1953), the court was presented with an issue closer to the case sub judice. Specifically, the court considered whether a lease agreement between a political subdivision and private party, for the lease of public land for one dollar, violated the constitutional prohibition against a pledge, loan or donation.
In 1933, the City of New Orleans entered into a lease agreement with the Disabled Veterans pursuant to an ordinance.[4] Subsequently, the City sought a ruling declaring the prior lease agreement null and void due to lack of valuable consideration because the lease violated the constitutional prohibition against the loan, pledge or donation of things of value of the state or political subdivision. The Disabled American Veterans maintained that the consideration for the lease of the land was that the veterans would pay the City one dollar each year, maintain insurance on the building, maintain and repair the building at the veterans' expense and assumption of responsibility for injuries suffered by anyone due to the condition of the premises or for any other reason. This court found the lease did not violate the constitutional prohibition against the loan, pledge or donation of public land based upon State v. Board or Com'rs of Port of New Orleans, supra. Moreover, the court recognized that while our Civil Law does not consider the payment of one dollar serious consideration, the Disabled Veterans' agreement to pay insurance premiums on a policy to cover the face value of the buildings, agreement to maintain the buildings' repair, assumption of risk for any injury or damage with respect to the property, and agreement to relieve the city of liability in the event of a claim, constituted valuable consideration. City of New Orleans v. Disabled American Veterans, 223 La. 367, 65 So.2d 797. Thus, the court concluded that the lease agreement did not violate the constitutional prohibition against the loan, pledge or donation of public property.
Another case interpreting Article VII, Section 14(A) was City of Port Allen v. Louisiana Mun. Risk Management, 439 So.2d 399 (La.1983). In City of Port Allen, the City filed a declaratory judgment action seeking a declaration that a newly enacted statute which imposed solidary liability on local government be declared unconstitutional. The City of Port Allen argued that La. R.S. 33:1349, the statute at issue, sought to impose solidary liability on *32 a political subdivision for payments of workers' compensation benefits of employees of another political subdivision. The City of Port Allen maintained that its agreement to be held solidarily liable for the benefits of another political subdivision, without being legally obligated to do so, amounted to a prohibited loan, pledge or donation within the meaning of Article VII, Section 14(A) of the Louisiana Constitution.
The court recognized the lack of case law interpreting Article VII, Section 14(A), stating:
[T]here is little jurisprudence interpreting the meaning of the 1974 provision. The 1921 Constitution, however, contained a provision which was virtually identical to the present Art. VII, § 14(A). Although subject to interpretation on numerous occasions by the Attorney General, the 1921 provision also produced little relevant jurisprudence. The cases that do exist hold primarily that this section is violated whenever the state or a political subdivision seeks to give up something of value when it is under no legal obligation to do so. [citations and footnotes omitted]

City of Port Allen, Louisiana v. Louisiana Mun. Risk, 439 So.2d at 401.
The court concluded that one municipality could not constitutionally agree to pay or be constitutionally compelled to pay a claim incurred by another municipality as a result of a tort or workmen's compensation claim, as such action "would be a donation or gratuity. Otherwise, it could be a loan. Both are prohibited by Art. VII, § 14(A) of the Constitution." Id.
The majority opines that our prior jurisprudence is "neither persuasive nor particularly applicable." At p. 23. I disagree with this conclusion. The cases cited above demonstrate that the key factor in determining whether Article VII, Section 14(A) is violated is whether the consideration given to the Board, under this agreement, is sufficient to find that the Board's corresponding use of public funds and property does not amount to a loan, pledge or donation in violation of Art. VII, Section 14(A). To find this agreement complies with the constitution would be inconsistent with this court's existing jurisprudence regarding Article VII, Section 14(A).
The majority finds the agreement between the Board and Cabella's constitutional permissible and authorized by the TIF statutes. I agree that the TIF statutes were adopted to encourage cooperative endeavors between public and private entities to facilitate economic growth. In fact, as the majority notes, TIF statutes were enacted in response to the scarcity of funds for redevelopment projects in blighted areas.[5] Louisiana's TIF statute certainly allows the Board to use public funds and property, however, the use of the public funds and property must be in compliance with the constitution. I do not believe that the use of public funds to wholly finance a private for-profit business, at the expense of small business owners and tax payers, was one of the envisioned uses of the TIF statute.
Recently, this court commented on the benefits and use of the TIF funding structure in Denham Springs Economic Development Dist. v. All Taxpayers, Property *33 Owners, 04-1674, (La.2/4/05), 894 So.2d 325. In Denham Springs, we noted that the TIF statute "is a chief tool used not only in Louisiana but in other states to encourage business development in economically depressed areas." Id., 04-1674, p. 14, 894 So.2d at 335. We further stated that "the statute, when used properly, promotes economic development and utilizes the money generated from the project to serve as a funding source." Id. This court has never stated that the TIF statute grants a political subdivision the authority to use public funds to finance private endeavors without consideration under the guise of economic development. Such action is impermissible and in violation of Article VII, Section 14(A). Moreover, this court has consistently held that in the exercise of legislative power, the legislature may not enact any legislation that is prohibited by the state's constitution. Unwired Telecom Corp. v. Parish of Calcasieu, 03-0732 (La.1/19/05), 903 So.2d 392, 403, Louisiana Associated General Contractors, Inc. v. Louisiana Dept. of Agriculture and Forestry, 05-0131, p. 15 (La.2/22/06)924 So.2d 90, 100. The constitution is the supreme law, to which all legislative acts must yield. World Trade Center Taxing Dist. v. All Taxpayers, Property Owners, 05-0374 p. 12 (La.6/29/05); 908 So.2d 623, 632, citing Macon v. Costa, 437 So.2d 806 (La.1983). Thus, the TIF Act cannot grant a political subdivision authority to take action which would otherwise be prohibited by the constitution.
An examination of this proposed financing agreement reveals that the Board is attempting to enter into an agreement with terms and effects which are constitutionally impermissible. Under the proposed financing structure, the Board purchases land from a private entity; issues bonds; and uses public funds to repay the bonds. In return, Cabela's pledges to encourage other businesses to relocate to the area and provides that it will pay "rent" for its use of the land. The categorization of certain payments as "rent" is deceptive and illusory. Under the lease agreement Cabela's agrees to pay property taxes on the land to the tax official for the parish.[6] Cabela's also agrees to pay maintenance cost, insurance premiums and improvement cost. Significantly, these payments are made to third parties and not to the Board. As the majority points out, Cabela's will "expend its own funds for the proper maintenance and repair" of the building. At p. 25. However, the payments made to the third parties, for insurance and maintenance cost will be credited to Cabela's in the event it exercises its option to purchase. Cabela will also be compensated handsomely to undertake management responsibilities under the Agreement with a salary of $1.9 million per year for those services. In addition, this management fee will also be credited to Cabela's in the event it exercises its option to purchase. This sum could amount to as much as $57,000,000 should the lease extend to the full thirty year bond period, more than the initial bond amount. Cabela's also states that its facility will employ residents of the community. However, Cabella's is not inextricably bound to employ Gonzales residents, Cabella's must only "use reasonable efforts to employ residents of the City." At p. 25. The creation of jobs in our communities is paramount to uplifting the economy and is valuable consideration. However, the substantial credit Cabela's receives for employing *34 workers negates any altruistic motive on the part of Cabela's.
An examination of the financing structure suggests that the Board, and the Board alone, is bearing all the financial burden of financing this privately owned enterprise, an act specifically prohibited by Article VII, Section 14(A). The financing scheme appears more akin to a disguised donation of public lands and funds rather than a lease agreement, and should Cabela's elect not to exercise its option to purchase, would amount to a loan of public funds and property. The majority opines that Cabela's is taking a great risk in developing its store in this area and promises to promote the local economy. I cannot see how Cabela's is taking any greater risk than any other business owner. A local business owner is more apt to employ local employees and have greater ties to the community. That same local business owner is not receiving credits for its business expenses nor is it being paid a "management fee" of $1.9 million dollars per year to engage in a for-profit business. When the benefits of the public entity are weighed against that received by the private entity, it is unimaginable how this financing structure amounts to anything other than a loan or donation of public property and funds. This financing structure uses public funds and property in a manner prohibited by Article VII, Section 14(A) of the Louisiana Constitution.
In addition, I also find that this funding structure does not fall within one of the "authorized uses" of Article VII, Section 14(B). Specifically, Section 14(B)(3) allows "the pledge of public funds, credit, property, or things of value for public purposes with respect to the issuance of bonds or other evidences of indebtedness to meet public obligations as provided by law." The key to this constitutional provision is "indebtedness to meet a public obligation." The Board seeks to use public funds to finance a retail facility which is privately owned. By entering into this agreement, the Board is creating a debt, without any obligation to do so. As we stated in City of Port Allen, a municipality may not obligate itself for debts of another if the debt is not otherwise legally owed. City of Port Allen, 439 So.2d at 402. The Board maintains that this Project will help the public by promoting economic development. However, the financing structure, as set forth in the Agreement, grants enormous financial benefits to the private retailer and developer, all at the public's expense. The most fundamental principle of this constitutional provision is that anything of value belonging to the state or political subdivision should not be given away. The constitution contains safeguards aimed at protecting public property and funds from gratuities which divest the public of its property. Without a legal obligation to do so, the Board cannot pledge public funds or property to finance this private enterprise. Therefore, I believe that the financing structure in this case is not an "authorized use" of public funds as contemplated in Article VII, Section 14(B).

CONCLUSION
Article VII, Section 14(A) prohibits the loan, pledge or donation of anything of value belonging to the state or political subdivision. Although political subdivisions retain plenary authority to take action to promote economic development, such action may not conflict with the constitution. The constitution is clear and unambiguous, any attempt to donate, loan or pledge public funds or property violates Article VII, Section 14(A). The financing structure sought to be used in this Project amounts to donation of public property and funds in violation of Article VII, Section 14(A). Accordingly, I respectfully dissent from the majority opinion and conclude that the *35 proposed financing structure is impermissible.
NOTES
[1] City of Gonzales, Louisiana, Ordinance # 2820 (Ordinance Introduced April 11, 2005; Ordinance Adopted April 25, 2005). The title of the ordinance states:

AN ORDINANCE CREATING AN ECONOMIC DEVELOPMENT DISTRICT WITHIN THE CITY, TO BE NAMED THE "GONZALES ECONOMIC DEVELOPMENT DISTRICT NO. 1", DEFINING THE BOUNDARIES THEREOF FROM WHICH AREA THE LOCAL AND STATE SALES TAX AND/OR AD VALOREM TAX INCREMENTS WILL BE DETERMINED AND USED TO FINANCE PROJECTS ON EITHER A CASE OR REVENUE BONDS BASIS TO BE ISSUED BY THE CITY OR ITS DESIGNEE TO FUND A PORTION OF THE COST OF ECONOMIC DEVELOPMENT PROJECTS IN ACCORDANCE WITH AND AS AUTHORIZED BY PART II OF CHAPTER 27 OF TITLE 33 OF THE LOUISIANA REVISED STATUTES OF 1950, AS AMENDED; AND PROVIDING FOR OTHER MATTERS IN CONNECTION WITH THE FOREGOING.
[2] At the special election for the rededication of the sales and use taxes, there were 876 votes cast in favor of the Proposition and 251 votes cast against the Proposition, with a majority of 625 votes being cast in favor of the Proposition.
[3] The proposition presented to the voters provided:

SUMMARY: AUTHORITY FOR THE CITY OF GONZALES TO ADD AN ADDITIONAL AUTHORIZED PURPOSE OF "PROMOTING ECONOMIC DEVELOPMENT" TO THE LISTS OF PREVIOUSLY AUTHORIZED PURPOSES FOR THE USE OF THE PROCEEDS OF ITS (A) 1% SALES AND USE TAX THAT WAS ORIGINALLY AUTHORIZED AT AN ELECTION HELD IN THE CITY ON SEPTEMBER 10, 1966, AND (B)½ % SALES AND USE TAX THAT WAS ORIGINALLY AUTHORIZED AT AN ELECTION HELD IN THE CITY ON APRIL 1, 1989.
Shall the proceeds of (a) the one percent (1%) sales and use tax previously authorized at an election held in the City of Gonzales, State of Louisiana (the "City") on September 10, 1966, and (b) the one-half of one percent (½ %) sales and use tax previously authorized at an election held in the City on April 1, 1989 (collectively, the "Taxes"), after paying the reasonable and necessary costs of collection and administration of the Taxes, be subject to use by Economic Development Districts created pursuant to Part II of Chapter 27 of Title 33 of the Louisiana Revised Statutes of 1950, as amended ("the "Act"), to promote economic development in the City through the use of incremental increases in sales and use tax collected within the boundaries of said districts in the manner provided and permitted by the Act, to the extent approved by the Mayor and Council of the City, in addition to the purposes set forth in the respective sales tax propositions originally approved at said elections held on September 10, 1966, and April 1, 1989?
[4] The bonds will bear interest at a rate not to exceed 6.615% in the first year and 7.50% thereafter, and will mature no later than 30 years from the date of issuance.
[5] Specifically, La. Const. art. VI, § 21 provides in its entirety:

(A) Authorization. In order to (1) induce and encourage the location of or addition to industrial enterprises therein which would have economic impact upon the area and thereby the state, (2) provide for the establishment and furnishing of such industrial plant, or (3) provide movable or immovable property, or both, for pollution control facilities, the legislature by law may authorize, subject to restrictions it may impose, any political subdivision, deep-water port commission, or deep-water port, harbor, and terminal district to
(a) issue bonds, subject to approval by the State Bond Commission or its successor, and use the funds derived from the sale of the bonds to acquire and improve industrial plant sites and other property necessary to the purposes thereof;
(b) acquire, through purchase, donation, exchange, and (subject to Article I, Section 4) expropriation, and improve industrial plant buildings and industrial plant equipment, machinery, furnishings, and appurtenances; and
(c) sell, lease, lease-purchase, or demolish all or any part of the foregoing.
(B) Property Expropriated; Sale to Aliens Prohibited. No property expropriated under the authority of this Section shall ever, directly or indirectly, be sold or donated to any foreign power, any alien, or any corporation in which the majority of the stock is controlled by any foreign power, alien corporation, or alien.
(C) Exception. This Section shall not apply to a school board.
[6] Defendants point to the following hypothetical scenario discussed at the Constitutional Conventional as support for their argument that the Project at issue is prohibited by La. Const. art. VII, § 14(A):

Mr. Anzalone: Now, we have an industry that wants to move into Tangipahoa Parish we'll say a private concern, they're going to put six hundred people which is of great benefit to our parish. Now, in exchange for them coming to our parish what we as a local government municipality parish government or otherwise would agree to do that we would buy the land for them on which they would construct this building and just give it to them. Now, is that type of activity prohibited by Number 1?
Mr. Perez: It is prohibited by (A) and I can't see where it's given back in (B).
Records of the Louisiana Constitutional Convention of 1973: Convention Transcripts, Vol. IX, p. 2897. As explained below, however, the land involved in the instant case will not be "just given" to Cabela's. Instead, Cabela's will be obligated to undertake several substantial obligations in exchange for the tax increment financing it will receive from the State and the City. Consequently, the hypothetical situation discussed by the delegates is distinguishable from the instant case.
[7] The Board, as owner of the land, is exempt from property taxes under La. R.S. 51:1160. The Agreement specifically recognizes that the lessor is exempted from paying ad valorem taxes, but that Cabela's "shall pay to the Lessor an annual rental amount for the Leased Premises during the Lease Term (the "Rent") equal to the amount which Lessee would have otherwise paid in ad valorem taxes if Lessee had been the owner of the Leased Premises during the year for which said Rent is paid."
[1] During World War I, the United States government constructed an elaborate army supply base on the river front in New Orleans on land bought by the government for the purpose of storage and transshipment of overseas freight. At the end of the war, the government had no use for the wharf. Because the government would not sell the land, the board of commissioners leased the wharf and ware-house for a term of twenty years for $114,250 the first year and $132,750 thereafter.
[2] The subleasee agreed to pay $713,200, payable in equal monthly installments, each in advance, and the total rental for the additional 10 years, if the lease was extended, would be $868,000, payable in equal monthly installments, each in advance.
[3] Article IV, Section 12 was re-designated in the 1974 constitution to Article VII, Section 14(A).
[4] The ordinance provided that the City was authorized to:

lease or give by donation to the Disabled American Veterans any building or land for veteran relief or club purposes if same be no longer necessary for governmental purposes.
[5] Interestingly, California's TIF statute is found in the title pertaining to Housing and Redevelopment. Many other states' TIF statutes refer to redevelopment of blighted housing in inner cities and were enacted to bolster the economy in a depressed area. See Gideon Kanner, THE PUBLIC USE CLAUSE: CONSTITUTIONAL MANDATE OR "HORTATORY FLUFF," 33 PEPLR 335 and William H. Simon, THE COMMUNITY ECONOMIC DEVELOPMENT MOVEMENT, 2002 WILR 377.
[6] The Board retains ownership of the land thus, the land is exempt from property taxes under La. R.S. 51:1160.