Dear Representative Hebert:
You requested an Attorney General's opinion regarding House Bill No. 678 of the 2007 Regular Session. You indicate that House Bill No. 678 provides for the "Insure Louisiana Incentive Program", under which the commissioner of insurance is authorized to make matching capital fund grants of state funds to private insurers who write property insurance in Louisiana with net written premiums at least with a ratio of two dollars of premium for each dollar of newly allocated insurer capital and the matching capital fund grant. You advise that while House Bill No. 678 purports that the Insure Louisiana Incentive Program would be adopted for the purpose of "economic development and stability in Louisiana", it effectively gives state funds to private insurers to enhance their capital.
You question whether proposed House Bill No. 678[1] is constitutional, and have requested that our office evaluate this proposed legislation in light of Article VII, Sec. 14(A) of the Louisiana Constitution, which provides in relevant part:
 (A) Prohibited Uses. Except as otherwise provided by this constitution, the funds, credit, property, or things of value of the state or of any political subdivision shall not be loaned, pledged, or donated to or for any person, association, or corporation, public or private.
Art. VII, Sec. 14 clearly prohibits the donation of public funds. The Louisiana Supreme Court has recently announced a new standard for determining whether Art. VII, Sec. 14 is violated. In Board of Directorsof the Industrial Development Board of the City of Gonzales, Louisiana,Inc. v. All Taxpayers, Property Owners, Citizens of the City of Gonzales,938 So.2d 11, 23, 2005-2298 (La. 9/6/06) (the "Cabela's" case) the Court found that "(Art VII) § 14(A) is violated when public funds or property are gratuitously alienated." Thus, if providing grants under the proposed Insure Louisiana Incentive Program are a gratuitous alienation of funds, the grants would be an unconstitutional donation pursuant to Art. VII, Sec. 14. If the grants are not gratuitous, then they would *Page 2 
be permissible. Although the court announced this new standard, they gave very little, if any, guidance as to how that standard is to be applied.
Cabela's involved the use of Tax Increment Financing to build a Cabela's retail outlet. Bonds were issued to pay for the construction of the retail outlet and related public improvements and infrastructure. The bonds were secured by the pledge of incremental tax revenues by the State and the City of Gonzales. Several agreements were entered into by the parties to the project. Cabela's agreed to acquire land and build the retail outlet and related public improvements and infrastructure. Upon issuance of the bonds, Cabela's agreed to transfer the property and improvements to the Industrial Development Board of the City of Gonzales, Louisiana, Inc. The Board would then lease the property and facilities to Cabela's, and the lease would contain an option to purchase. Cabela's was to then manage the retail center. The agreements also called for additional development of adjacent property to attract complimentary retail and commercial ventures.
A bond validation suit was filed seeking a judicial declaration of the validity and legality of the project, the project documents and the bonds. A response was filed asserting that the project amounted to an unconstitutional donation of public funds to a private entity in violation of La.Const. Art. VII, Sec. 14. The Court concluded that the project was not a prohibited loan, pledge or donation of public funds. In its reasons the court stated:
 The documents clearly reveal that both the State and the City have not entered into the obligations at issue gratuitously. Clearly, both parties expect to receive something of value in return for the performance of their obligations. As evidence of the non-gratuitous intent of the public parties, the Agreement contains a provision that states unequivocally:
 The City and State have determined that the Project serves a public purpose and that, based solely on financial projections and other information provided to it by the [District], the Annual Pledged Local Increment and the Annual Pledged State Increment pledged and dedicated hereby, collectively is less than the financial benefits to be received by each as a result of the Project.
 Additionally, the Agreement also contains a provision wherein the State's expectations are specified as follows:
 The State hereby acknowledges that there is a reasonable expectation that the Project will result in economic development within the State which will exceed the value of the obligations of the State contained herein thereby serving a public purpose.
 In the absence of any other evidence, these statements, standing alone, *Page 3 
would be insufficient to allow us to conclude a non-gratuitous intent on the parts of the State and the City. Taken as parts of the Agreement and related documents as a whole, however, they provide insight into the intent of the parties, and reveal that neither the State nor the City intend to enter into a gratuitous contract with Cabela's and Carlisle.[2]
The Court looked at the intent of the public entities to conclude that the alienation of funds was non-gratuitous. The public entities demonstrated a non-gratuitous intent by showing that the project served a public purpose, that financial projections showed financial benefits to the entities exceeded the amount pledged, and that they had a reasonable expectation that the economic benefit from the project would exceed the obligations undertaken by the public entities. These factors alone were not enough to show a non-gratuitous intent on the part of the City and the State. However, when looking at these factors, along with the project and the related documents as a whole, the Court concluded that there was a non-gratuitous intent on behalf of the City or the State. Basically, the Court looked at the transaction as a whole to see if it passed the "smell test".
We glean three things from the Cabela's case when it comes to determining whether an expenditure is gratuitous. First, it is evident that there must be a public purpose when expending funds. Second, the transaction must be looked at as a whole, and can't appear to be gratuitous on its face. Third, public entities must have an expectation of receiving something of value when expending public funds. TheCabela's decision doesn't make it clear exactly what that value is or how it is calculated. In Cabela's, the non-gratuitous intent of the public entities was demonstrated upon a showing by the entities that they expected to receive more than what they gave up. While the Court didn't state that such a showing was necessary, it did make it clear that such a showing was an important factor in its decision. Therefore, it is clear to our office that a public entity must receive more than a nominal return or some minimal value in order for an expenditure to be non-gratuitous. If a public entity can show that it reasonably expects to receive at least equivalent value for the funds it expends or property it transfers, that would seem to show a non-gratuitous intent.
Based upon the foregoing, it is the opinion of our office that in order for an expenditure or transfer of public funds or property to comply with Art. VII, Sec. 14(A), the public entity must show:
 1. A public purpose for the expenditure or transfer;
 2. That the expenditure or transfer, taken as a whole, does not appear to be gratuitous; and *Page 4 
3. Evidence demonstrating that the public entity has a reasonable expectation of receiving a benefit or value at least equivalent to the amount expended or transferred.
House Bill 678, if enacted, will establish the Insure Louisiana Incentive Program ("Program") in order to attract new property insurance market capacity. The goals of the Program appear to be to increase the availability of property insurance, to increase competitive pressure on insurance rates and to reduce the volume of business written by the Louisiana Citizens Property Insurance Corporation ("Citizens"). House Bill 678 authorizes the State to provide grants to insurance companies as an incentive to encourage additional insurers to participate in the voluntary property insurance market. Because of this authority, the State may give public funds to private insurance companies, provided the grants are not prohibited donations under Art. VII, Sec. 14(A).
As we indicated, Art VII, Sec. 14(A) is violated when public funds or property are gratuitously alienated. Grants given out under the proposed Program will be non-gratuitous if the State meets the three criteria listed above. With respect to the public purpose for the grants, House Bill 678 provides, in proposed Sec. 3302:
 § 3302. Purposes; public purpose
 A. Louisiana currently is experiencing a crisis in the availability and affordability of insurance for residential and commercial properties. Louisiana property owners and their insurers sustained catastrophic losses in 2005 from Hurricanes Katrina and Rita. As the result of their losses and their assessment of the risk of loss from future storms, many insurers have substantially reduced their participation in the voluntary market for residential and commercial property insurance. With fewer insurers in the voluntary market, competitive pressure on premium rates is reduced. Current underwriting practices have resulted in a substantial increase in the number of Louisiana property owners forced to obtain their property insurance coverage or their coverage for the wind peril from Louisiana Citizens Property Insurance Corporation ("Citizens"), the state insurer of last resort. As a result of the 2005 storms, Citizens has a substantial deficit that currently is and must be funded by assessments against insurers and policyholders. The decline in the voluntary insurance market substantially increases Citizens' exposure, thereby threatening to worsen its financial condition. Increased premiums and assessments makes property insurance coverage unaffordable for some property owners, forcing them to sell or abandon their residential or commercial properties or preventing them from restoring storm damaged properties, causing some residents to leave or fail to return to the state. The availability of property insurance at reasonable cost is essential to the economy of the state. Owners cannot invest in and lenders will not finance the construction and ownership of residential and commercial buildings *Page 5 
without adequate property insurance protection. The state has a vital interest in fostering the availability of property insurance at reasonable cost.
 B. The Insure Louisiana Incentive Program is adopted for the purpose of economic development and stability in Louisiana by encouraging additional insurers to participate in the voluntary property insurance market in order to substantially increase the availability of property insurance, to substantially increase competitive pressure on insurance rates, and to substantially reduce the volume of business written by the Louisiana Citizens Property Insurance Corporation, thereby offering a less expensive alternative to its policyholders and reducing Citizens' exposure to an increased deficit and future assessments.
 C. It is hereby declared by the legislature that assuring an adequate and affordable market for insurance for both residential and commercial properties in this state is essential to the economic viability of the state and its citizens, the assurance of an adequate and stable tax base for the state and its political subdivisions, and the health, welfare, and safety of its citizens. Accordingly, the establishment of the Insure Louisiana Incentive Program is declared and demonstrated to be an essential public function and public purpose.
House Bill 678, if enacted, will constitute a declaration of the legislature that the Program is for a public purpose. Thus, it appears that the Program, and the grants provided thereunder, are for a public purpose.
In reviewing the proposed legislation, and looking at the Program as a whole, we see nothing to indicate that the grants are gratuitous, as there are obligations imposed on the insurers receiving the grants. Insurance companies will be required to make a commitment of capital of not less than two million dollars to write property insurance in the State. The grants will be matching funds for the newly allocated insurer capital funds. It is our understanding that the capital and the matching funds must be set aside as a reserve for the payment of claims. Insurers who receive grants must write property insurance in the state with net written premiums at least a ratio of two dollars of premium for each dollar of the total of newly allocated insurer capital and the matching capital fund grant. Twenty-five percent of net written premium must be received form policyholders whose property was formerly insured by Citizens. The insurers will be required to write policies for a period of five years. Clearly, there are obligations imposed upon the parties receiving the State grants.
We spoke to representatives from the Governor's Office and the Department of Insurance, and were informed that there are several benefits that this Program provides. As a result of the Program, there will be more available capital to write property *Page 6 
insurance in the State. The Program will encourage more insurance companies to participate in the voluntary market for residential and commercial property insurance. The proposed legislation supposes that this will increase the availability of property insurance and increase competitive pressure on insurance rates. Because twenty-five percent of net written premiums must be received from policyholders whose property was formerly insured by Citizens, the volume of business written by Citizens will decrease. This is expected to lessen the exposure that Citizens has from claims.
If the State can show evidence demonstrating that it has a reasonable expectation that the benefits to the State are at least equivalent to the amount of grant money given out under the Program, then House Bill 678, the proposed Insure Louisiana Incentive Program and the grants provided thereunder would not appear to be prohibited under Art. VII, Sec. 14.
It has come to our attention that the House Insurance Committee proposed an amendment to original House Bill No. 678 to avoid any possible constitutional prohibition on giving public funds to private companies. Although we have not reviewed the proposed amendment, it is our understanding that the amendment would require insurance companies receiving grants under the proposed Program to sign cooperative endeavor agreements with the State in order to receive such grants.
Our office certainly concurs that the use of a cooperative endeavor agreement would be a valid method to document the three criteria required to show the non-gratuitous intent of the grants. The cooperative endeavor agreements should set forth the public purpose, the obligations of the parties and the benefits to be received by the State. However, a cooperative endeavor agreement, in and of itself, will not make the grants constitutional. Grants to be given out under the proposed Insure Louisiana Incentive Program are either constitutional or they are not. An unconstitutional grant of funds does not become constitutional merely because the recipient enters into a cooperative endeavor agreement with the public entity.
Paragraph (C) of Art. VII, Sec. 14 provides in pertinent part that "[f]or a public purpose, the state and its political subdivisions. . . may engage in cooperative endeavors with each other. . . or with any public or private association, corporation, or individual." La.Const. Art. VII, Sec. 14(C). It should be noted, however, that although paragraph (C) authorizes the State to engage in cooperative endeavors for a public purpose, it does not create an exception or exemption from the general constitutional norm. Rather, it merely supplements the prohibition against donations found in Section 14(A). The Louisiana Supreme Court has ruled that all cooperative endeavors authorized by Section 14(C) must also meet the general standard for non-gratuitous alienation of public funds or property established by Section 14(A). Cityof Port Allen v. Louisiana Risk Management, Inc., 439 So.2d 399 (La. 1983); Board of Directors of the Industrial Development Board of the Cityof Gonzales v. All Taxpayers, et al., 2005-2298 (La. 9/6/06), 938 So.2d 11. *Page 7 
Trusting this adequately responds to your request, we remain
Yours very truly,
CHARLES C. FOTI, JR.
ATTORNEY GENERAL
BY:__________
KENNETH L. ROCHE, III
Assistant Attorney General
[1] Our office has reviewed original House Bill 678 in preparing this opinion. For purposes of this opinion, we will assume that House Bill 678 is enacted into law as filed, with no amendments.
[2] Id. at 24.