ROSEMARY LEDET, Judge.
| ¶ This is a suit for declaratory and in-junctive relief. The principal issue is whether the director of the New Orleans Department of Public Works (“DPW”) was authorized to issue a permit to a residential association, Newcomb Boulevard Association (“NBA”), to permanently close Newcomb Boulevard, a dedicated public street, at the intersection of Freret Street. Plaintiffs are two residents who live in the immediate vicinity of the intersection— Derek Huston and Keith Hardie, Jr. — and two neighborhood associations — Maple Area Residents, Inc. (“MARI”) and Car-rollton/Riverbend Residents? Association (“CRRA”)(collectively “Plaintiffs”). The defendants are the City of New Orleans (the “City”); John H. Shires, in his official capacity as DPWs director; and Robert Mendoza, as Mr. Shires’ successor. NBA was granted leave to intervene as a defendant in order to enforce its alleged right to maintain the permanent barrier — an ornate, wrought iron fence that it cemented into the ground at the intersection (the “Fence”). From |2the trial court’s judgment granting Plaintiffs’ motion for summary judgment, NBA appeals.[1]
FACTUAL AND PROCEDURAL BACKGROUND
In 1916, Newcomb Boulevard became a dedicated public street. Newcomb Boulevard is a narrow (22 feet wide), two-way street (with a third parking lane). It is approximately 1400 feet long with no cross streets or outlets. Newcomb Boulevard is located in close proximity to two colleges, Tulane University and Loyola University. Until 2006, Newcomb Boulevard was one of the few through streets in the university area that connected St. Charles Avenue and Ferret Street.
According to Mr. LeClercq (NBA’s former president), the residents of Newcomb Boulevard for several decades had expressed to the City their concerns regarding the safety issues created by speeding vehicles given the unique characteristics of their street. Mr. LeClercq stated that “[t]he residents had asked the City of New Orleans to take some action to address those issues, but nothing was done.” [2]
In April 2005, Urban Systems, Inc. (“USI”) submitted the findings of its study, done at the City’s request, regarding the traffic on Newcomb Boulevard. The report states that the residents of Newcomb Boulevard reported two major concerns: speeding and cut-through traffic. The report concludes that speeding exists[3] and recommends the use of speed humps as a traffic calming measure. The [..¡report, however, recommends that “[f]ur-ther study should be considered before implementation of such devices.” As to cut-through traffic, the report indicates that the residents believed their street was being used as a cut-through “to avoid congestion on St. Charles Avenue.” The report, however, concludes that the amount of cut-through traffic was “normal and not *602 excessive.”[4]
In late 2005, Newcomb residents submitted a petition to the City requesting relief from the speeding and safety problem on their street. The matter was referred to DPW’s director, Mr. Shires. On January 31, 2006,[5] Mr. Shires, in his official capacity, issued a letter (also referred to as a “permit”) directed to Mr. LeClercq, as NBA’s president, authorizing the closure of Newcomb Boulevard at Freret, stating:
We have reviewed the request and plan dated January 24, 2006 to close New-comb Boulevard at Freret Street.[6] This letter shall serve as your approval to proceed with the closure of the street at Freret Street subject to your compliance with the applicable City of New Orleans Department of Public Works specifications. The normal and customary review by the Departments of Sanitation, Fire, and Parks and Parkways has been done and those Departments have no objection to the proposed closure.
You will install the turnaround for single unit trucks designed by Urban Systems, Inc. and pay for that installation, allow for continued pedestrian access, continued public parking outside the turnaround area, and will obtain the servi-tudes for the turnaround in favor of the City of New Orleans.
Prior to the commencement of work you will need to notify the Department of Public Works, Fire Department, Sanitation Department and Parks and Parkways for the necessary permits.
|Jn the summer of 2006, a temporary barrier (yellow concrete blocks) appeared at the intersection of Freret Street and Newcomb Boulevard. Later that year, a permanent barrier, the Fence, was erected at the intersection. The Fence blocked all vehicular traffic from entering or leaving Newcomb Boulevard at Freret Street and rendered Newcomb Boulevard a dead end street (cul-de-sac). The Fence thus precluded vehicular traffic from using New-comb Boulevard to travel between Freret Street and St. Charles Avenue. To alert motorists, a “No Outlet” sign was placed on the corner of Newcomb Boulevard and St. Charles Avenue. At the Fire Department’s request, NBA incorporated a removable panel into the Fence to permit emergency access. The sidewalk at the intersection remained open, allowing pedestrian and bicycle access. Newcomb Boulevard residents funded all of the work associated with the installation of the Fence.
In January 2007, Mr. Hardie and Mr. Huston, residents living in the immediate vicinity of Newcomb Boulevard, filed this suit against the City and Mr. Shires in his official capacity as DPWs director. Mr. Hardie and Mr. Huston averred that they regularly used Newcomb Boulevard as a means of navigating between Freret Street and St. Charles Avenue before it was closed. They alleged, among other things, that the Fence was improperly authorized by DPWs director without approval of the New Orleans City Council (“City Council”) *603 or the City Planning Commission. Plaintiffs sought declaratory and injunctive relief to have Newcomb Boulevard returned to its original status as a through street. Simply stated, the relief Plaintiffs sought is to have the Fence removed.
15In April 2007, an amending and supplemental petition was filed joining as plaintiffs two neighborhood associations, MARI and CRRA, and as defendant Mr. Mendoza, in his official capacity as DPWs director (as Mr. Shires’ successor). In July 2007, NBA filed a motion for leave to file a petition for intervention to enforce its right to maintain the Fence. In its motion, NBA averred the following:
In January 2008, the trial court, over Plaintiffs’ objection, granted NBA’s motion for leave to intervene as a defendant.
• Newcomb [NBA] is a neighborhood association representing the interests of the residents of Newcomb Boulevard, New Orleans, Louisiana.
• Newcomb [NBA] legally obtained the permission of the City of New Orleans through the Director of Public Works to erect the traffic barrier.
• John Shires, the former Director of the Department of Public Works, approved the plan to erect the traffic barrier and to redirect cut-through traffic from Newcomb Boulevard by letter, dated January 31, 2006.
• Newcomb [NBA] hired the engineer, surveyor, and architect to design the turnaround and [F]ence, complied with the request of the Fire Department to include a removable center panel in the [F]ence, and coordinated the design and construction with City employees.
• In June of 2006, representatives of Newcomb [NBA] met with Mr. Hardie [a plaintiff] to discuss the plan. Mr. Hardie waited until after the construction was complete to bring this lawsuit.
• Newcomb [NBA] paid for all of the work itself at a cost of approximately $65,000. No City money was spent on the project.
Cross-motions for summary judgment were filed by the parties. Following a hearing on the motions, the trial court, on March 27, 2012, rendered judgment granting Plaintiffs’ motion for summary judgment and denying the defendants’ |fi(NBA’s and the City’s) motions for summary judgment. In its judgment, the trial court framed the central issues presented as two-fold:
1) Whether the closure of Newcomb Blvd. at Freret Street to vehicular traffic was accomplished by the installation of a “traffic control device”.
2) Whether the Director of Public Works, John Shires, exceeded his authority in the letter of Jan. 31, 2006 (wherein he gave “approval to proceed with the closure of the street at Freret Street ...” when the traffic study commissioned by the City called for speed humps.
The trial court found that there was no genuine issue of material fact as to the following factors:
• The iron fence is not a temporary structure or a traffic control device.
• Newcomb Boulevard is a formally dedicated street whose revocation can only be accomplished by formal action of the City Council.
• The Home Rule Charter [the “Charter”] grants the power to control franchises, privileges and permits concerning public streets to the City Council.
• The closure of Newcomb Boulevard at Freret Street violated the Council’s plenary charter authority to control changes in streets.
*604 • The Director of Public Works did not have the authority under the City Code to grant a permit , to close New-comb Boulevard.
• The Director of Public Works did not have the authority to install the [F]ence as a traffic control device.
• The City of New Orleans violated [La. Const.,] Article VII [§ 14(A) ] by permitting a private association to erect and maintain a private fence barring vehicular traffic on a dedicated public street.
The trial court further found that DPW’s director’s authorization of the permit resulted in a usurpation • of City Council’s plenary power to control changes in the streets.
The trial court still further found that the installation of the Fence was “done in an arbitrary and capricious manner.” In so finding, the trial court noted that “[i]n |7the Trianon Plaza matter, the residents were similarly concerned about speeding and cut-through traffic, but the process utilized by the City to approve closure was different.”[7] Continuing, the trial court noted that the following steps were taken in Trianon Plaza matter:
1. Trianon was initially closed on a “trial basis” to determine whether “non-local traffic ... can be accommodated elsewhere without serious congestion or delay.” ...
2. Trianon residents were allowed to convert the “trial” closure to a “permanent closure” only after public hearings were held by the Planning Commission and the City Council;
3. The Council made an explicit finding that Trianon was “no longer needed for public purposes” ...;
4. The residents of Trianon were “required to purchase” the street bed for $97,000.00 and to assume the cost of its maintenance and street lights in order to convert the “trial basis” closure to a “permanent closure of Trianon Plaza to non-local traffic.”
The trial court thus found that “[w]hen the Newcomb [Boulevard] closure is compared to the closure of Trianon Plaza, the abuse of power is crystal clear.” Finally, the trial court noted that “[t]he evidence in this case demonstrates the lack of any critical analysis of the cost/benefits of closing Newcomb Boulevard at Freret Street and its impact to all New Orleanians.” This suspensive appeal by NBA followed.
DISCUSSION
This court recently summarized the standard of review of a trial court’s ruling granting a motion for summary judgment, pursuant to La. C.C.P. arts. 966 and 967 and the jurisprudence, as follows:
18Appellate courts review the grant or denial of a motion for summary judgment de novo, using the same criteria applied by trial courts to determine whether summary judgment is appropriate. This standard of review requires the appellate court to look at the pleadings, depositions, answers to interrogatories, and admissions on file, together ■with the affidavits, if any, to determine if they show that no genuine issue as to a material fact exists, and that the mover is entitled to judgment as a matter of *605 law. A fact is material when its existence or nonexistence may be essential to the plaintiffs cause of action under the applicable theory of recovery; a fact is material if it potentially insures or precludes recovery, affects a litigant’s ultimate success, or determines the outcome of the legal dispute. A genuine issue is one as to which reasonable persons could disagree; if reasonable persons could reach only one conclusion, no need for trial on that issue exists and summary judgment is appropriate. To affirm a summary judgment, we must find reasonable minds would inevitably conclude that the mover is entitled to judgment as a matter of the applicable law on the facts before the court.
The summary judgment procedure is designed to secure the just, speedy and inexpensive determination of actions. Summary judgments are favored, and the summary judgment procedure shall be construed to accomplish these ends. The code provides that where [as in the instant case] the party moving for summary judgment will not bear the burden of proof at trial, their burden does not require them to negate all essential elements of the adverse party’s claim, but rather to point out to the court that an absence of factual support exists for one or more elements essential to the adverse party’s claim. Thereafter, if the adverse party fails to produce factual support sufficient to establish that it will be able to satisfy its evidentiary burden of proof at trial, no genuine issue of material fact exists, and the movant is entitled to judgment as a matter of law. The adverse party cannot rest on the mere allegations or denials of his pleadings when a motion for summary judgment is made and supported by affidavits, but is required to present evidence establishing that material facts are still at issue.
Johnson v. Loyola University of New Orleans, 11-1785, pp. 7-8 (La.App. 4 Cir. 8/8/12), 98 So.3d 918, 923-24.
The jurisprudence has held that questions of law are appropriate for resolution within the summary judgment framework. See Levy v. Enterprise Leasing Co. of New Orleans, 08-650, p. 2 (La.App. 3 Cir. 4/8/09), 8 So.3d 839, 841 (citing State Farm Mutual Automobile Insurance Company v. U.S. Agencies, \JL,.L.C., 05-0728 (La. App. 1 Cir. 3/24/06), 934 So.2d 745, and noting that “interpretation of a statute is a question of law that may be decided by a motion for summary judgment”); Cutsinger v. Redfem, 08-2607 (La.5/22/09), 12 So.3d 945 (noting that interpretation of an insurance contract is a question of law that can be resolved in the framework of a motion for summary judgment). “When addressing legal issues, a reviewing court gives no special weight to the findings of the trial court. It conducts a de novo review of questions of law and renders a judgment on the record.” Campbell v. Markel American Ins. Co., 00-1448, p. 5 (La.App. 1 Cir. 9/21/01), 822 So.2d 617, 620 (citing Gaylord Container Corp. v. CNA Ins. Companies, 99-1795, p. 9 (La.App. 1 Cir. 4/03/01), 807 So.2d 864, 870). Such is the case here.
The cross-motions for summary judgment raise the legal issue (question of law) of whether DPW’s director had the power to authorize NBA, a private organization, to permanently close a public street by erecting the Fence without obtaining City Council’s approval. Finding DPW’s director lacked the power, the trial court granted Plaintiffs’ motion for summary judgment. Based on our de novo review, we affirm.
For purposes of our analysis, we summarize NBA’s arguments on appeal as fol *606 lows:[8]
(i) The Charter empowers DPW’s director to control traffic and to regulate city streets; this power includes the discretionary authority to 110erect traffic control devices, such as the Fence, to enhance safety.
(ii) The Fence is not a complete street closure requiring City Council approval.
(iii) The erection of the Fence did not constitute a donation of public property in violation of La. Const., art. 7, § 14(A) because the City retained ownership of the street, which remains available for public use.
We separately address each of these issues.
(i) DPW’s director’s power to control traffic and regulate streets
NBA’s position is that the placement of a traffic control device, such as the Fence, on a residential street to enhance safety is not a legislative power; rather, it is an executive function within DPW’s director’s
discretionary authority to control traffic and regulate streets.[9] In support, NBA cites Charter § 4-901, which provides that DPWs director shall:
(1) Provide for the design, construction, paving, maintenance, and marking of streets, bridges, and related structures and approaches.
(2) Supervise, regulate and control installations in, above or under streets....
(4) Collect and compile traffic data as directed by the Mayor or by ordinance; prepare engineering studies with regard to vehicular and pedestrian traffic as directed by the Mayor or by ordinance; prescribe regulations governing traffic and parking on streets and other public places; and determine the type need, and location of all traffic control devices and marking and install, design, construct, operate, and maintain them.
NBA, based on the City’s responses to its requests for admission,[10] offers the following syllogism:
*607 hi. DPW’s director has the authority to make decisions concerning the placement of traffic control structures.
2. Decisions concerning the placement of traffic control structures are within the discretion of DPWs director.
3. The decision to permit the traffic control structure on Newcomb Boulevard, the Fence, was within DPWs director’s discretion.
NBA contends that there is no requirement in the Charter that DPWs director obtain City Council’s approval to exercise its discretionary authority to install traffic control devices, such as the Fence and barricades.[11] NBA further contends that DPWs director’s exercise of its discretionary authority to install traffic control devices does not violate City Council’s authority under the Charter to control certain changes in streets.
According to Plaintiffs, the crux of NBA’s argument is that DPWs director may exercise the means of its assigned function of installing traffic control devices to seek the discretionary end of determining whether a public intersection should be closed. That discretionary end, Plaintiffs contend, is reserved to City Council, as the governing authority, by the Charter, the City Code, the statutes, and the jurisprudence. See Hero Lands Co. v. City of New Orleans, 566 So.2d 149, 152 (La.App. 4th Cir.1990) (holding that the authority to close an intersection is inherent in City Council’s power to regulate the physical development of the City and citing numerous cases in which a government entity was held to have the authority to close a street, to alienate a roadway, and to withdraw the dedication of a street); City of New Orleans v. Badie, 146 La. 550, 552, 88 So. 826, 827 (1920) |12(“[t]he city, through its own council, is vested with control over its streets ...”); Scott v. City of West Monroe, 95 So.2d 343, 346 (La.App. 2d Cir.1957) (“a city, through its governing authority, is vested with control over its streets and may make reasonable regulations for their use”).[12]
Plaintiffs contend that DPWs director’s limited power concerning installations in streets does not permit it to determine which streets will be closed by an installation. Rather, when an installation will close an intersection — which Mr. Shires’ letter (permit) authorized the NBA to do at the Freret Street intersection — City Council must first authorize the street closure before DPWs director can “supervise, regulate, and control” the installation used to implement the closure. We agree.
A review of the governing statutory, Charter, and City Code provisions and the relevant jurisprudence supports the trial court’s finding that DPWs director lacked the unilateral authority to issue the permit authorizing the permanent closure of Newcomb Boulevard at Freret Street by erecting the Fence; City Council approval was required. The applicable principles that support this finding are as follows:
• Newcomb Boulevard is a formally dedicated street whose revocation can only be accomplished by formal action of City Council. See State, Dept, of Transp. & Development v. Scramuzza, 96-1796, p. 8 (La.4/8/97), 692 So.2d 1024, 1029 (noting that a formal act of revocation is necessary to revoke a statutory dedication of a street). See also Bragg Apartments, Inc. v. City of *608 Montgomery, 281 Ala. 253, 256, 201 So.2d'510, 512 (1967) (citing 75 A.L.R. 760, 762, and holding that a city may not permanently close a public street simply by adopting a resolution).
• The Legislature has “granted to municipalities the legal authority to alienate public property not needed for public purposes in La. R.S. 33:4712(A).” | mLake Terrace Property Owners Ass’n v. City of New Orleans, 567 So.2d 69, 73 (La.1990).[13]
• “Under § 3-112(5)(d) of the home rule charter, the Council is empowered to adopt proposed ordinances alienating any immovable property and granting any servitude, franchise or privilege.” Coliseum Square Ass’n v. City of New Orleans, 544 So.2d 351, 359 (La. 1989).[14]
• “There are no general or constitutional prohibitions against a home rule entity closing a public street and alienating it for a private purpose- The authority to abandon a public street is inherent in the power of a municipality to regulate its physical development. ...” Giambelluca v. Parish of St. Charles, 96-364, p. 11 (La.App. 5 Cir. 1/14/96), 687 So.2d 423, 428 (citing Hero Lands, supra.)
• Under the Charter, City Council has the power to “regulate the physical development of the city,” which includes the inherent power to close an intersection. Hero Lands, 566 So.2d at 152; see Charter § 5-402(3)(b)[15] and § 5-405(3)(b).[16]
L* Under La. R.S. 48:512, it is unlawful to construct any structure on a public *609 street without approval of the governing authority.[17] The governing authority of the City is City Council. See La. Const., art. VI, § 44(4) (defining the “governing authority” as “the body which exercises the legislative functions of the political subdivision”).
• Under the City Code, the general rule is that City Council’s permission is required to construct any structure on a public street. City Code, § 146-276.[18] An exception is recognized for temporary revocable permits for the use of the public streets; DEW’S director is authorized to issue such temporary permits. City Code § 146-315.[19]
Consistent with the above principles, the trial court, in its reasons for judgment, concluded that “[w]hile the Director of Public Works has the authority and discretion to install traffic devices and provide permits for temporary street 11r,closures (due to festivals, block parties, etc.), only the City Council has authority to permanently close a street.” NBA contends that the jurisprudence the trial court relied in support of this conclusion (Hero Lands, Badie, and Scott) is not controlling because none of the cited cases addresses the issue of DPWs discretionary power to erect traffic control devices. Contrary to NBA’s contention, the jurisprudence which the trial court cited (Hero Lands, Badie, and Scott) stands for the principle for which it was cited — the authority to permanently close a public street is vested in the governing authority, City Council.
NBA’s argument that DPWs director had the discretionary authority to approve *610 the Fence pursuant to its power to regulate traffic and regulate streets hinges on its classification of the Fence as a form of traffic control device. The trial court rejected that classification. Explaining its finding that the Fence is not a form of traffic control device, the trial court stated:
The court posed a hypothetical question to the defendants as to whether the Director of Public Work’s placement of “Ferdinand the Bull” at the intersection of Newcomb and Freret would constitute a “traffic control device.” While the defendants maintained that such an expansive definition would be an absurdity, they nevertheless concluded that the bull would indeed be a lawful installation of a traffic control device by the Director of Public Works. Further, the gate prohibits traffic; it does not control the flow of traffic (i.e., stop, go[,] turn, yield, slow, etc.). Traffic control devices are uniform in shape. Gates are not. The gate in question was not obtained from the City’s traffic control device supplied.
Even assuming, arguendo, that the Fence is a form of traffic control device, DPWs director, as Plaintiffs point out, lacks the power to use the means of a traffic control device to accomplish the discretionary end of closing an intersection. The power to close an intersection is reserved by the Charter, City Code, statutes, and jurisprudence to the governing authority, City Council. It is |1fithus unnecessary to address the issue of whether the Fence is a form of traffic control device.[20]
ii) Street closure
NBA contends that the Fence is not a street closure requiring City Council approval (as was required in the Trianon Plaza matter) because it does not: (i) permanently transfer Newcomb Boulevard to its residents, (ii) foreclose public pedestrian use, (iii) foreclose vehicular traffic or public parking, or (iv) foreclose public bicycle use. NBA cites the Trianon Plaza matter as an example of a permanent and complete street closure requiring City Council approval. NBA contends that several factors were present in the Trianon Plaza matter that are lacking in this case, and it offers the following comparison:
• Trianon Plaza involved a permanent cessation of the public’s right to use the street — Newcomb Boulevard remains open for public use;
• Trianon Plaza involved a permanent, irrevocable transfer of the street to its residents — Newcomb Boulevard remains city property;
• The City determined that Trianon Plaza was “no longer needed for any public purpose” (including pedestrian and parking purposes) — no such finding has been made with respect to New-comb Boulevard.
NBA further contends that the Fence is not a street closure requiring City Council approval because it “merely restricts automobile entrance at one end of a long narrow street in order to alleviate a hazard.” NBA still further contends that the Fence is not a permanent street closure because DPWs director can order it removed at any time.
Plaintiffs counter that, contrary to NBA’s suggestion, “[t]he intersection of Newcomb at Freret is closed to automobile and legal bicycle traffic, and the 117[F]ence not only prevents automotive traffic between Newcomb and Freret, but also prevents any citizen from accessing the strip *611 of public land on which the [Fjence sits.”[21] Moreover, Plaintiffs contend that the conversion of Newcomb Boulevard to a dead end street (cul-de-sac) effectively limits the use of the public street only to Newcomb Boulevard residents and those persons visiting or those businesses making deliveries to those residents. Newcomb Boulevard can no longer be used for non-local, through traffic.
NBA’s argument that there was no street closure is belied, as Plaintiffs point out, by the DPWs director’s letter (the permit), which expressly authorizes the “closure” of Newcomb Boulevard at Freret Street. Indeed, the letter uses the term “close” or “closure” three times.[22] Moreover, the letter contains no indication that the permit is temporary. Stated another way, the letter provides for no temporal limitation on the permit. Nor is the Fence a temporary structure; rather, it is a permanent, wrought iron structure that is cemented into the ground.
Regardless of whether the erection of the Fence resulted in a complete or partial street closure, an obstruction of an intersection, or a conversion of a through street to a dead end street (cul-de-sac), the result, as Plaintiffs contend, is the same— City Council approval was required. See Coliseum Square, supra (public street closure); Worthen v. DeLong, 99-1149 (La.App. 1 Cir. 6/23/00), 763 So.2d|18820 (construction of a fence to obstruct a right of way); and Hero Lands, supra (conversion of an intersection to a cul-de-sac or dead end street).
iii) Donation of public property
The final issue is whether the trial court erred in finding that the permit authorizing the erection of the Fence constituted a donation of public property in violation of La. Const., art. 7, § 14(A).[23] NBA contends that there was no constitutional violation for the following three reasons:
(i) no public funds are at issue — the Newcomb Boulevard residents paid for the erection of the Fence;
(ii) no public property has been alienated; no sale, lease, servitude, or privilege was granted to NBA; and
(iii) even assuming, arguendo, an alienation of public property, the erection of the Fence served a public purpose by addressing the safety concern posed by speeding through traffic and thus was not a gratuitous alienation. See Board of Directors *612 of Indus. Development Bd. of City of Gomales, Louisiana, Inc. v. All Taxpayers, Property Owners, Citizens of City of Gonzales, 05-2298, p. 4 (La.9/6/06), 938 So.2d 11, 14 (holding that an alienation of public property is not gratuitous when it serves a public purpose).
Plaintiffs counter that while there was no formal transfer of title to NBA, the permit authorized NBA to take control of a public intersection. They argue that the Fence prevents other members of the public from accessing the strip of land under it and from accessing Newcomb Boulevard from Freret Street by vehicle. This obstruction, they contend, is a violation of the public’s right to use public property. See Worthen, 99-1149 at p. 7, 763 So.2d at 825 (noting that “[i]f the DeLongs were 119allowed to fence in the portion of the right-of-way adjoining their property, they would inevitably obstruct the public use of that segment of land.”).
Because the Newcomb Boulevard residents, unlike the Trianon Plaza residents, were not required to purchase the public right of way and to assume responsibility for its maintenance, a violation of La. Const., art. 7, § 14 occurred. Contrasting the Newcomb Boulevard closure with the Trianon Plaza matter demonstrates the appropriate steps the City should have taken, in addressing NBA’s request to erect the Fence, to avoid a constitutional violation. Mr. Shires, in his capacity as DPWs director, alluded to this point in his letter to the City Council in which he voiced his approval of the permanent closure of Tria-non Plaza; he stated:
In 2002, Trianon Plaza was closed at the Walmsley Avenue end, as requested, on a trial basis....
Given the configuration of streets in this area, the trial period has demonstrated that the non-local traffic volumes which previously utilized Trianon Plaza can be accommodated elsewhere without serious congestion or delay. The more basic issue which arises is whether the closure of a given block of a public street should be considered on the lone premise that the residents have the desire to eliminate through traffic.
Trianon Plaza is somewhat unique in that it consists of only one block.... The ongoing' frequency of complaints relative to speeding in residential neighborhoods would likely prompt many such proposals from every part of the city.
Inasmuch as the maintenance of these streets, their rights-of-way, and the utilities below is performed by public funds and agencies, they should remain open to public usage. The potential exists, should a given block not be essential to area circulation, of private ownership. To achieve this, the abutting property owners would be required to purchase the public right-of-way at market value and bear all future roadway and utility maintenance costs. Should the residents commit to this option, the Department of Public Works would have no objection to the permanent closure of Trianon Plaza to non-local traffic.
|20UnIike in the Trianon Plaza matter, Mr. Shires authorized the closure of Newcomb Boulevard without obtaining approval of either the City Planning Commission or City Council and without requiring that Newcomb Boulevard residents purchase the public right-of-way and assume the maintenance costs. The result was an illegal donation of public property in violation of La. Const., art. 7, § 14.
NBA’s reliance on the City of Gonzales, supra, as dictating a different result is misplaced. In that case, the Louisiana Supreme Court explained that the constitutional prohibition against donating public *613 property is intended “to prohibit a gratuitous alienation of public property.” City of Gonzales, 05-2298 at p. 15, 938 So.2d at 20. To establish the lack of a gratuitous alienation, NBA was required to show the benefits to the public as a whole, not to Newcomb Boulevard residents. As Plaintiffs point out, the benefits from the Fence flowed almost entirely in favor of New-comb Boulevard residents, not the general public. As noted, the conversion of New-comb Boulevard to a dead end street effectively limited the use of the public street only to local traffic — Newcomb Boulevard residents and persons visiting or those businesses making deliveries to those residents. The Newcomb Boulevard residents thus obtained free use of a public intersection, a decrease in vehicular traffic on their street, and a quieter street. The general public, on the other hand, suffered the loss of the right to use Newcomb Boulevard as a through street and an increase in traffic congestion on neighboring streets. Moreover, as Plaintiffs point out, the general public suffered the loss of the revenue that would have been produced if Newcomb Boulevard residents had been treated in the same manner as the Trianon Plaza residents — required to purchase the public right-of-way and to assume the maintenance costs.
. _J¿jFor these reasons, we find no error in the trial court’s finding that there was a violation of La. Const., art. 7, § 14(A) as a result of the City “permitting a private association [NBA] to erect and maintain a private fence barring vehicular traffic on a dedicated public street.”

DECREE

For the foregoing reasons, the judgment of the trial court granting Plaintiffs’ motion for summary judgment is affirmed.
This matter is remanded to the trial court for further proceedings.
AFFIRMED AND REMANDED

. The City neither filed its own appeal nor joined in NBAs appeal.

. The City disputed NBA’s allegation that it did nothing in response to the residents' prior complaints.

 The report indicates that "the total traffic exhibit 85th percentile speeds greater that [sic] the posted speed limits.”

. The report indicates that "statistically, it would appear that since 46% of the total traffic on Newcomb Boulevard is ‘cut-thru’ traffic, a total of 352 vehicles in a 24 hour period in this area of the city is considered to be normal and not excessive.”

. The record reflects that Mr. Shires issued the letter (permit) on his last day in office.

.The record does not contain a copy of the plan dated January 24, 2006. At the summary judgment hearing, Plaintiffs' counsel pointed out that Plaintiffs "sent specific discovery requests directed to what the plan was that was referred to in Mr. Shires' letter. There was no production made on that. Mr. LeClercq, the head of NBA, was asked in his deposition ... He said he didn’t know.”

. The Trianon Plaza matter arose out of a request by residents that their street be closed to non-local traffic, to alleviate the problem caused by cut-through traffic of students who attended a nearby high school, St. Mary's Dominical High School. Similarly, in this case, the Newcomb Boulevard residents requested their street be closed to non-local traffic to alleviate the problem caused by cut-through traffic of students who attended nearby colleges, Tulane University and Loyola University.

. On appeal, NBA asserts the following three assignments of error:
1. Contrary to the trial court’s ruling, the erection of the traffic barrier did not violate the Council's plenary charter authority to control changes in streets; and the Department of Public Works (DPW) does have the authority to control traffic based on hazardous street conditions.
2. Contrary to the trial court's ruling, the traffic barrier is a temporary structure and a traffic control device which does not constitute a street closure requiring City Council approval.
3. The City of New Orleans did not violate La. Const., art. VII § 14 by permitting NBA to erect the barrier.

. NBA emphasizes that the City has a “May- or-Council form of government" under which the power of government is divided between the Legislative Branch (City Council) and the Executive Branch. The DPW is part of the Executive Branch. NBA further emphasizes that the Charter delegates to DPW's director, as an arm of the executive branch, the power to control traffic and regulate streets.

.Plaintiffs contend that NBA's reliance on the responses to requests for admission by an aligned party is misplaced. See Kittrick v. GAF Corp., 125 F.R.D. 103 (M.D.Pa.1989). Plaintiffs further contend that requests for admissions cannot be used for issues of law. See Grevemberg v. G.P.A. Strategic Forecasting Group, Inc., 06-0766, p. 10, n. 5 (La.App. 1 Cir. 2/9/07), 959 So.2d 914, 920(noting that "Louisiana Code of Civil Procedure article 1466 does not authorize a request for admission of a conclusion of law. Instead, the article authorizes only requests for admission of ‘relevant matters of fact' and the genuineness of documents” and citing Ball Mktg. Enter, v. Rainbow Tomato Co., 340 So.2d 700, 702 (La.App. 3rd Cir. 1976)). Given our finding in Plaintiffs’ favor on other grounds, we find it unnecessary to reach this issue.

. NBA cites the deposition testimony of Mr. Mendoza that DPW’s director, acting on his own discretionary authority, has used barricades to close streets in other areas of the City.

. For ease of reference, these three cases are subsequently referred to as "Hero Lands, Ba-die, and Scott."

. La. R.S. 33:4712(A) provides: .
A. A municipality may sell, lease for a term of up to ninety-nine years, exchange, or otherwise dispose of, to or with other political corporations of this state, or private persons, at public or private sale, any property, or portions thereof, including real property, which is, in the opinion of the governing authority, not needed for public purposes.

. Charter § 3-112(5)(d) provides:
Proposed ordinances on any of the following specified subjects can be adopted only at a regular meeting of the Council and shall not be adopted until at least twenty calendar days have transpired beginning on the day after the date of introduction of the ordinance and not until a notice of the introduction of such proposed ordinance shall have been published in the official journal of the City not less than seven calendar days nor more than fourteen calendar days after the introduction thereof, which notice shall state the substance of the proposed ordinance and the date of the meeting at which the Council shall begin its consideration thereof:
[[Image here]]
(d) Alienating any immovable property or granting any servitude, or privilege.

. Charter § 5-402(3)(b) provides that the City Planning Commission shall “[pjrepare and recommend to the Council, all to be consistent with the Master Plan” the following:
(b) The Official Map of the City and amendments thereto, upon which shall be shown all existing and established streets, recommended street lines, all streets or street lines located on final or recorded plats of subdivisions, and the location of existing or planned parks and other open spaces. Street locations on final or recorded plats of subdivisions shall constitute amendments to the Official Map and shall be placed thereon.

. Charter § 5-405(3)(b) provides:
After the adoption of the Official Map or any plat showing the lines of planned or mapped streets, no change in any street shall be made by the Council until such proposed change shall have been submitted to the Commission for its approval or disapproval for conformity with the Official Map. Pending the adoption of the Official Map, the Council shall not vacate, narrow, or extend any existing street without having secured the approval of the Commission thereon.

.La. R.S. 48:512 provides:
A. No person shall close, obstruct, or change any legal road, public road, or street, as defined in'R.S. 48:491 and being a parish or municipal road, except upon order of the governing authority of the parish for a parish road, whether or not within a municipality, or upon order of the governing authority of the municipality for a municipal road, except as hereinafter provided.
B. If any public road or street is closed, obstructed, or changed in violation of the provisions of this Section; the governing authority of the parish or the governing authority of the municipality shall summarily open the road, remove all obstructions therefrom, and restore it to its former condition, at the expense of the person who closed, obstructed, or changed the public road or street.
C. The governing authority of Orleans Parish may authorize a person to close, obstruct, or change a public road or street for a period not to exceed twelve consecutive months, provided that the governing authority determines that it is for a public purpose and in the best interests and for the benefit of the parish or municipality, provided further that such closing shall occur only after consultation with and approval by the secretary of the department, provided further that all obstructions be removed therefrom and the public roads or streets be restored for use by the general public at the sole expense of the person authorized to close, obstruct, or change a public road or street, and provided further that the removal of obstructions and the restoration of the public roads or streets be completed within the period authorized by the governing authority, which period shall not exceed twelve months.

. City Code § 146-276 provides:
It shall be unlawful for any person to construct or maintain or operate any structure or service on, above or beneath the public streets and other public places within the city without permission of the council in accordance with the regulations provided in this article....

. City Code § 146-315 provides:
The issuance of temporary revocable permits for the use of the public streets and other public places when the furnishing of a public service is temporarily required shall be under the jurisdiction of the director of the department of public works -in accordance with the regulations described in this division.

. Although NBA assigned as error the trial court’s finding that the fence was not a traffic control device, it failed to brief that issue.

. Plaintiffs point out that because the Fence blocks the entire roadway at the intersection, bicycle traffic can only access Newcomb Boulevard at Freret Street by use of the sidewalk. See City Code § 154 — 1416 (providing that "[n]o person 15 or more years of age shall ride a bicycle upon any sidewalk in the city nor will bicycles be allowed on sidewalks in the business district.”)

. The pertinent portion of the letter states:
We have reviewed the request ... to close Newcomb Boulevard at Freret Street. This letter shall serve as your approval to proceed with the closure of the street at Freret Street subject to your compliance with the applicable City of New Orleans Department of Public Works specifications. The normal and customary review by the Departments of Sanitation, Fire, and Parks and Parkways has been done and those Departments have no objection to the proposed closure. (Emphasis supplied).

.La. Const., art. 7, § 14(A) provides:
Except as otherwise provided by this constitution, the funds, credit, property, or things of value of the state or of any political subdivision shall not be loaned, pledged, or donated to or for any person, association, or corporation, public or private. Except as otherwise provided in this Section, neither the state nor a political subdivision shall subscribe to or purchase the stock of a corporation or association or for any private enterprise.